1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   --------------------------------x
                                        18-CR-204(NGG)
3   UNITED STATES OF AMERICA,
                                        United States Courthouse
4            Plaintiff,                 Brooklyn, New York

5            -against-                  June 12, 2018
                                        2:00 p.m.
6   KEITH RANIERE AND ALLISON MACK,

7            Defendants.

8   --------------------------------x

9

10       TRANSCRIPT OF CRIMINAL CAUSE FOR STATUS CONFERENCE
            BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
11            UNITED STATES SENIOR DISTRICT JUDGE

12

13  APPEARANCES

14  For the Government:      UNITED STATES ATTORNEY'S OFFICE
                             Eastern District of New York
15                           271 Cadman Plaza East
                             Brooklyn, New York 11201
16                           BY:  MOIRA KIM PENZA, AUSA
                                  TANYA HAJJAR, AUSA
17                                KARIN K. ORENSTEIN, AUSA

18
    For Defendant Raniere:   BRAFMAN & ASSOCIATES, P.C.
19                           767 Third Avenue
                             New York, New York 10017
20                           BY:  MARC A. AGNIFILO, ESQ.
                                  TENY GERAGOS, ESQ.
21                                -and-
                             DEROHANNESIAN & DEROHANNESIAN
22                           677 Broadway, Suite 707
                             Albany, New York 12207
23                           BY:  PAUL DEROHANNESIAN, II, ESQ.
                                  DANIELLE R. SMITH, ESQ.

24

25

```
1    APPEARANCES(Continued)

2    For Defendant Mack:        KOBRE & KIM LLP
                                800 Third Avenue
3                               New York, New York 10022
                                BY:  SEAN STEPHEN BUCKLEY, ESQ.
4                                    WILLIAM F. MCGOVERN, ESQ.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   Court Reporter:           Georgette K. Betts, RPR, FCRR, CCR
                                Phone:  (718)804-2777
22                              Fax:    (718)804-2795
                                Email:  Georgetteb25@gmail.com
23

24   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
25
```

1          THE COURT:  Please be seated in the back.

2          THE COURTROOM DEPUTY:  Criminal cause for status

3    conference.  Counsel, please state your appearances.

4          MS. PENZA:  Moira Kim Penza for the United States.

5    Good afternoon, Your Honor.  With me at counsel table are AUSA

6    Tanya Hajjar and Karin Orenstein.  And with Your Honor's

7    permission, Samantha Fry, who is an intern with our office who

8    is currently attending Harvard Law School.

9          THE COURT:  Very good.  Thank you.

10          MS. PENZA:  Thank you, Your Honor.

11          THE COURT:  Please be seated.

12          Yes.

13          MR. AGNIFILO:  Good afternoon, Your Honor, Marc

14    Agnifilo, Teny Geragos and with Your Honor's permission we

15    have an intern with us, Sophia Agnifilo.  We represent

16    Mr. Raniere.  And we also have co-counsel.

17          MR. DEROHANNESIAN:  Paul DerOhannessian and Danielle

18    R. Smith.

19          THE COURT:  Okay.  Where does she go to law school?

20          MR. AGNIFILO:  She's still in undergrad, Your Honor.

21          THE COURT:  Undergrad.  Welcome.  Yes.

22          MR. BUCKLEY:  Good afternoon, Your Honor, Sean

23    Buckley and William McGovern of Kobre Kim on behalf of

24    Ms. Mack, who is seated at counsel table as well.

25          THE COURT:  Please be seated everyone.  Thank you

1   and welcome.

2          At this point I'd like to hear from the government

3   as to the status of the pretrial developments.

4          MS. PENZA:  Thank you, Your Honor.

5          Your Honor, the government has been providing

6   discovery on an ongoing basis.  We -- as we represented

7   originally, there is a significant amount of discovery in this

8   case.  We have recently received additional discovery.  We

9   intend to make a further production this week and we expect

10  that it will still be ongoing for some period of time.  We

11  just received, for example, two email accounts, Your Honor,

12  that we believe will contain, at the very least, Rule 16

13  evidence to be provided to the defendants and we're going to

14  do that as expeditiously as possible.

15         We also, as we expressed to Your Honor, there are at

16  least -- there is at least one account where we have firewall

17  concerns and we have set up a firewall team.  We have an FBI

18  agent and an AUSA who are assigned to that and they will be

19  reviewing materials quickly so we can produce those as well.

20         THE COURT:  Now, I set a trial date of October 1st,

21  when will you be done with your discovery transfers to the

22  defendants?

23         MS. PENZA:  Your Honor, it is difficult for us to

24  estimate right now because we are still in the process of

25  receiving certain materials.  We do intend to do it on a

1    rolling basis.  As we did tell Your Honor earlier, we do

2    expect -- at our last status conference, we do expect a

3    superseding indictment in this case and that there will be

4    additional discovery obligations in accordance with the

5    superseding indictment as well.

6              THE COURT:  So this would be a superseding

7    indictment as to these defendants?

8              MS. PENZA:  As to these defendants -- as to these

9    defendants, yes.

10             THE COURT:  And what about the issue of any

11   additional defendants that might come along and whether we

12   would be having one trial or more than one trial in this case?

13             MS. PENZA:  Your Honor, at this time, based on our

14   ongoing investigation and the charges that we do expect to

15   bring in the superseding indictment, which we have made

16   representations to at least Mr. Agnifilo on the phone earlier

17   this week, that we expect to do that within the next month and

18   a half, we would be seeking -- the government would expect

19   that the defendants that we seek to charge would be tried at

20   the same time based on the charges that we anticipate

21   bringing.

22             THE COURT:  So let me just understand this in terms

23   of scoping out my schedule and not to put you in a corner, but

24   believe it or not this is not my only case, so are we talking

25   about a trial of a week, a month --

1          MS. PENZA:  Your Honor, we anticipate --

2          THE COURT:  -- three months?

3          MS. PENZA:  We anticipate it would be more in the

4    range of three months.

5          THE COURT:  A three-month trial.  That's including

6    the defense?

7          MS. PENZA:  Yes.

8          THE COURT:  All right.  Let me hear from the

9    defense.

10          MR. AGNIFILO:  Thank you, Your Honor.

11          Our concern, and maybe it's not first and foremost,

12    our concern is if new defendants are added a month and a half,

13    two months from now, and if it's the government's position

14    they want to have one trial rather than multiple trials, I can

15    imagine the scenario where a defense lawyer coming into this

16    case and a defendant coming into this case for the first time

17    in say August, says an October 1st trial date is not possible

18    for him or her, and then the date gets moved or it does not,

19    that's up to Your Honor.  And so it's related to a couple of

20    things, not the least of which is our bail application, and I

21    can do that whenever Your Honor is ready for me to do that.

22          THE COURT:  Well, I was trying to ascertain whether

23    I should set a motion schedule at this point and what it

24    appears is that because you haven't received all of the

25    discovery, it would be very difficult for you to agree to a

1   motion schedule if we establish a motion schedule where we

2   don't yet know how much work is going to be involved on your

3   part in making such a motion, and facing -- working back from

4   an October 1st trial date.  As a practical matter, if there's

5   a superseding indictment and that superseding indictment

6   includes other defendants, it's going to restart the clock

7   anyway and then there's the question of if some of the people

8   indicted are potentially cooperators, there are all kinds of

9   issues here.  This is a more complicated case than your garden

10  variety felon in possession case, for instance, or even a

11  larceny case or any of those.  So what I'm trying to get a

12  sense of is whether what we're really talking about in terms

13  of timing, and it's actually I think premature to set a motion

14  schedule.

15          Last time, with all due respect to the government,

16  they said it would be four to six weeks or something like that

17  and we would have a superseding indictment.  I thought it was

18  scheduled today, a meeting for today we'd have a better

19  understanding what the timing would be for a trial, but now

20  that's been pushed back and we're talking about July or

21  August, right?

22          MS. PENZA:  Yes, Your Honor.

23          THE COURT:  Right.  So what I think I ought to do is

24  make a schedule such that we have a status conference in July

25  and we see where we are.  And if we have to go ahead with just

1    a trial of two people on October 1st, you can hurry up and

2    make your motions at that point.

3              Does that sound reasonable?

4              MR. AGNIFILO:  That's good for us, yes.

5              THE COURT:  I know it's good for you.

6              MR. AGNIFILO:  I agree.

7              THE COURT:  I think you would agree with that.  And

8    the government, what it does to the government is it tells the

9    government that they have to move with alacrity to deal with

10   any additional potential defendants in the case so that we

11   have a better sense of how many people I would be trying and

12   then we can figure out when I'm going to try them.

13             There's one time we're not trying this case, the

14   month of December there is not going to be a trial because

15   it's not fair to jurors.  So I just don't do December -- I've

16   learned after 18 years that I don't conduct long trials with a

17   two-week break for Christmas and New Year's and Hanukkah and

18   Kwanza, I've got everything covered now, and so it would have

19   to be after the first of the year, which is the winter, which

20   brings other issues along the way, but there's also the

21   question of should any of the defendants remain in custody,

22   then there's that concern as well.

23             MR. AGNIFILO:  Understood.

24             THE COURT:  It's also a concern for someone who is

25   on house arrest.  It's not pleasant, even though it's at home

1    it is still not pleasant and I understand all of that and

2    there is a presumption of innocence which we have to recognize

3    and appreciate.

4          So why don't we set a schedule for the next meeting.

5    But before we do, let me hear from Ms. Mack's counsel.

6          MR. BUCKLEY:  Thank you, Your Honor.  We have

7    nothing to add to Your Honor's assessment and agree with it in

8    all respects.

9          THE COURT:  All right.  Thank you.  So we need to do

10   something late in July.

11         MS. PENZA:  Yes, Your Honor.

12         THE COURT:  How about Wednesday, July 25th?

13         MR. AGNIFILO:  That's fine, Your Honor.

14         THE COURT:  Is that okay for Ms. Mack's counsel?

15         MR. BUCKLEY:  Yes, Your Honor.

16         MS. PENZA:  That's fine for the government, Your

17   Honor.

18         THE COURT:  We'll do that at 2 p.m. on Wednesday,

19   July 25th.

20         And you have an application?

21         MS. PENZA:  Yes, Your Honor.  In light of the

22   ongoing trial process, we would like to exclude time in order

23   to allow the preparation for trial.  I do not -- I don't know

24   Ms. Mack's current position.  Last time Ms. Mack's position

25   was that she wanted to waive Speedy Trial to continue to

1   engage in plea negotiations.  At this time the government is

2   still willing to engage in such plea negotiations, but we have

3   not heard from defense counsel.

4           THE COURT:  Let's start with Ms. Mack's counsel.

5           Does Ms. Mack's counsel consent to the exclusion of

6   time?

7           MR. BUCKLEY:  Your Honor, we have no objection to

8   the exclusion.  We understand that additional discovery is

9   forthcoming as soon as this week, so we have no objection

10  because we need the additional time to review discovery and

11  consider motions.

12          THE COURT:  Mr. Agnifilo.

13          MR. AGNIFILO:  We do not consent to the exclusion.

14          THE COURT:  All right.  Under the statute, the time

15  is excluded as Ms. Mack's counsel has not objected to the

16  exclusion of time between now and July 25th.  The time is

17  excluded between today and July 25th, 2018, in the interest of

18  justice for the continuation of discovery delivery and plea

19  negotiations.

20          MS. PENZA:  Thank you, Your Honor.

21          THE COURT:  So that brings us to the next issue.

22          MR. AGNIFILO:  Yes, Your Honor.

23          Your Honor, we've given the Court a fairly length

24  written submission, the government has responded, we replied.

25  I think given the circumstances of this case, a reasonable and

1    appropriate set of bail conditions would be to have

2    Mr. Raniere released on a 10 million-dollar bond; he would be

3    secured by, at a minimum of two armed security professionals

4    with TorchStone, and we have the former director of the U.S.

5    Secret Service is sitting in the second row, third from the

6    right, Mark Sullivan, who would be working with torch -- there

7    he is, he has his hand up in the air, Judge.  Who would be

8    working with TorchStone as part of the security detail.

9           Let me put a few things --

10          THE COURT:  I'm really curious about this concept

11   that someone would be on house arrest basically guarded by

12   people with guns.  What is the purpose of having armed guards?

13   Is the purpose of having armed guards that in case the

14   individual being guarded tries to flee, they have the

15   authority to stop him or her and possibly use their guns to

16   stop the defendant?  In other words, to shoot and kill

17   somebody, which sounds absurd to me frankly on its face, or is

18   it to stop people from coming in, like reporters or people who

19   feel wronged by the individual, and then protect the

20   individual by shooting the intruder.  What is the purpose of

21   an armed guard?

22          MR. AGNIFILO:  Sure.  So to Your Honor's first

23   question, it is my understanding of the state of the law that

24   someone can consent to physical force being used on him or her

25   but cannot legally consent to deadly physical force being used

1    on him or her.  So we would consent to physical -- let me --

2         THE COURT:  So then you need a couple of Karate

3    experts, you don't need someone with a gun.

4         MR. AGNIFILO:  If I were more imaginative I would

5    have led with that.  So the idea really at the end of the day

6    is it's an emphasis on trust rather than arms.  And it's a

7    matter of integrity, it's a matter of reputation.  The last

8    thing, frankly, I want, the last thing that TorchStone wants,

9    Mr. Sullivan wants is for this to go in the wrong direction,

10   because that's -- we'd have to come back in front of Your

11   Honor and nobody wants to be in that position.  So the guns

12   are, I don't know, the icing on the cake.  What really keeps

13   him there is there are guards -- let me back up.  This goes to

14   Your Honor might have been wondering why I structured the bail

15   application the way I did and there's a reason.

16        There is a trust, a defense trust that has been

17   created since the inception this case.  It's being

18   administered by a trustee.  The trustee has a lawyer and no

19   defense costs -- and I say this because the renting of the

20   apartment, the paying of the armed guards would be defense

21   costs which could not be paid unless it were ordered by Your

22   Honor.  So the guard, just to be clear, the guards and the

23   apartment would be paid from this irrevocable trust that's

24   been created.  Right now there is no apartment because there's

25   no bail condition authorizing the expenditure of money on an

1    apartment.  So the idea is this --

2              THE COURT:  I'm like the co-trustee if I agree to

3    this.

4              MR. AGNIFILO:  I --

5              THE COURT:  It's a condition precedent to the

6    expenditure of the funds that the Court agree to something of

7    this nature.

8              MR. AGNIFILO:  It ends up being that, but it's not

9    that by design.  It's that because they can't spend anything

10   unless it's a reasonable defense cost and it's not currently,

11   as we sit here today, a reasonable defense cost because it's

12   not been ordered.

13             THE COURT:  Well, I'm not aware of the trustee's

14   name, I'm not aware of who the settlors are of the trust, I'm

15   not aware of the funds that are in the trust, but put all that

16   aside, this is not your client's money.

17             MR. AGNIFILO:  Correct.

18             THE COURT:  No one is coming forward to be a -- to

19   sign on this bail application, right?

20             MR. AGNIFILO:  The way it's currently situated,

21   that's correct.

22             THE COURT:  Right.  The purpose of having

23   individuals act in that capacity is that they place some moral

24   suasion on the defendant to adhere to the terms of the

25   release.  But there is no one to do that in this case, the way

1     you have structured it.

2              MR. AGNIFILO:  That's correct.

3              THE COURT:  I'm only talking about your concept.

4              MR. AGNIFILO:  Yes.

5              THE COURT:  This is a concept.

6              MR. AGNIFILO:  That's right.

7              THE COURT:  And so someone can write a check for a

8     large sum of money, take a million dollars just out of air

9     here, put it into an irrevocable trust and that trust could be

10    used for the purposes that you have outlined, but there's no

11    moral suasion placed upon the defendant to adhere to the terms

12    of the bail because, frankly, he has nothing to lose.  The

13    only people who have something to lose are the settlors of the

14    trust and perhaps the trustee for some fiduciary misbehavior,

15    if that should happen, but there's nothing really that keeps

16    the defendant in tow in effect or -- he has no family members

17    who are going to sign the bond, he's just -- it's just him.

18             And so the question then becomes, assuming that we

19    go forward with something like this, how does -- apart from

20    the fact that there is money available, how does this

21    guarantee that your client doesn't get on an airplane at

22    Teterboro Airport without any kind of travel documentation and

23    fly on a private plane to a place where he gets off the plane

24    and nobody knows where he is, the flight plan changed in

25    mid-flight, that happens, and he's gone?  And then the only

1   thing that's out there is the bond company, which has to pay

2   $10 million because he absconded.

3        MR. AGNIFILO:  There is two things:  First,

4   Mr. Sullivan and the other agents of TorchStone aren't going

5   to let him do that.  They're not going to let him leave.

6        Now, I think to Your Honor's other question, the

7   rules of engagement, as I understand it -- and it's a direct

8   question, I want to give Your Honor a direct answer -- I don't

9   believe they've been authorized to shoot him unless it were an

10  independently dangerous situation.  It's a complicated

11  analysis and probably not one that I'm able to make.  But

12  that's what -- we have very experienced former law enforcement

13  personnel who are putting their reputations on the line and

14  rather than moral suasion, we have guards.  Moral suasion is

15  usually the thing that's compelling in these courtrooms for

16  bringing something back.  Here we have something that's more

17  immediate and more compelling, I submit, which is that we have

18  actual guards, at least two of them depending on the location,

19  who are not going to let him leave and who, if there was any

20  inkling of him trying to leave or do anything inappropriate

21  whatsoever in violation of Your Honor's condition, would

22  immediately tell anybody Your Honor wanted us to tell,

23  including the prosecutors, including pretrial, including the

24  Court if the Court wanted to be involved in that.  Anybody

25  Your Honor wanted us to tell they're going to tell.  This is

1    not the kind of thing where anybody is going to want that to

2    happen.

3              My job in this case is if the case goes to trial, I

4    try the case.  The guard's job is to make sure Mr. Raniere is

5    safe, secure, that he comes back to court each and every time

6    he has to come back to court through the end of this

7    proceeding.  So what we lack in moral suasion, and Your Honor

8    is right about that, I think we more than make up for in armed

9    personnel who are going to secure an apartment that, not that

10   Mr. Raniere chooses, that they choose.  We're happy to have

11   pretrial services or anyone from the government or the FBI

12   involved in that process.  We're not trying to keep anybody

13   out.

14             And the benefits really are these, and I think this

15   is a significant one.  We have a very, appropriately so,

16   restrictive protective order in this case.  I think it is

17   easier, it's safer, it's more secure to review discovery not

18   in a prison setting and to prepare a defense in a fairly

19   complicated case, and a complicated case where there might be

20   superseding indictments into the future and we all know the

21   government is continuing to investigate, not in a prison

22   setting.

23             And here while it's a little, admittedly, unorthodox

24   the way we structured the bond package, I think it's very

25   effective.  He won't have his passport, he can't apply for new

```
1    passports and he's going to be watched by guards with a GPS

2    monitor.  So there really are belts and suspenders on this

3    one.  He can't leave because Pretrial Services will have a GPS

4    monitor on his ankle.  He can't leave because he doesn't have

5    a passport to leave and he can't leave because he has armed

6    guards who are former very high level law enforcement

7    officials whose own credibility -- and I mean that's really at

8    the end of the day I think, you know, a form of moral suasion

9    and not on the defendant but on the integrity of the process.

10   The last thing these guys are going to want to have to happen

11   is Keith Raniere sneaks out behind their back.  That would be

12   a disaster for them professionally.  It would be a disaster

13   for me professionally, I'll say that in front of Your Honor.

14   Nobody wants that to happen, that would be horrible.

15          And I have every reason to expect that he's going to

16   come back to court, he's going to fight this case.  I don't

17   want to get too much into the merits of the case, I think it's

18   a triable case, it's an interesting case, it's a serious case

19   and it's a triable case.

20          THE COURT:  What about the situation with him going

21   down to, what was it, Puerto Vallarta --

22          MR. AGNIFILO:  Mexico.

23          THE COURT:  -- Mexico and staying in a gated

24   community and operating an email account with the protection

25   that he couldn't be -- he couldn't be checked as to his email.
```

1          MR. AGNIFILO:  So I think for better or worse --

2          THE COURT:  Why?  Why would you do that if you were

3    not trying to evade law enforcement?

4          MR. AGNIFILO:  Because there are two, in what I've

5    seen, well-entrenched, passionate factions having nothing to

6    do with law enforcement that surround Mr. Raniere.  There are

7    people in Nxivm and in DOS, some of whom are very loyal to

8    Mr. Raniere, and there are people who have left Nxivm and/or

9    DOS who are, from what I've seen, equally passionate

10   anti-Raniere folks.

11         And I don't tend to reference the press in Court

12   matters, but I think it's interesting to note, I think The New

13   York Times magazine piece the journalist noted people were

14   taking photographs of her and others at different points in

15   time.  So there's no reason to think -- and I can go through

16   the details of Mexico, there is no reason to think Mr. Raniere

17   was evading law enforcement.  I think he was trying to remain

18   secure in the face of people who I don't think mean him well.

19   And that's certainly his belief and that's the belief of some

20   other people.  I don't besmirch these people, they are

21   entitled to their views.  But Your Honor asked why would he do

22   that and I think that's the reason.

23         The reason more pointedly, and I know the government

24   was concerned about his trip to Mexico, the mother of his

25   child's visa was about to expire and they traveled to Mexico

```
 1    and when they traveled to Mexico -- we have this in our

 2    written submission --

 3              THE COURT:  But they are not living in Puerto

 4    Vallarta, they are living five hours away somewhere.

 5              MR. AGNIFILO:  I think you're right, I don't think

 6    they're in Puerto Vallarta.

 7              THE COURT:  He's in one place and they are more than

 8    down the road, they are in another area of the country.

 9              MR. AGNIFILO:  I can double check, I thought they

10    were all together.  Just give me one second, Your Honor.

11              MS. PENZA:  Your Honor, at the time of the

12    defendants apprehension in Mexico the mother of his child I

13    believe was in Monterrey, while the defendant was in the

14    Puerto Vallarta area with DOS slaves.

15              THE COURT:  With who?

16              MS. PENZA:  With DOS slaves including his

17    co-defendant, Ms. Mack.

18              THE COURT:  Oh, you called them DOS slaves, I see.

19    All right.

20              MR. AGNIFILO:  So --

21              THE COURT:  So, look, I understand that your

22    presentation, very extensive, clear presentation, I'm

23    concerned about the fact that what could happen is that you've

24    got these law enforcement people, who retired, who are in this

25    organization, this company, and if he has people who are mad
```

1    at him then everybody is at risk because he's at risk.  If

2    these people come after him and then you've got people

3    protecting him with guns.  This is not your ordinary bail

4    application, you understand that.

5              MR. AGNIFILO:  I do, I do.  But I don't think

6    there's any reason to think that anyone is going to resort to

7    violence.

8              THE COURT:  No.

9              MR. AGNIFILO:  We haven't had that.  This group, and

10   what I mean by the group sometimes it was one group, and then

11   people left, are much more in to trying to figure out who is

12   speaking to who and what they are saying.  I mean, they are

13   much more likely to try and hack into -- I'm not suggesting

14   any of this, I'm just saying what I think the reasonable fear

15   would be, they are trying to hack into different

16   communications rather than hurt someone.  I don't think

17   there's -- I have not seen any evidence of anyone trying to

18   hurt anyone and so we don't have that problem under our

19   situation because he's not going to have any Internet access.

20   If Your Honor permits him to have a computer on site, it's not

21   going to be hooked up to the Internet.  We're going to

22   basically stick a disk in it and go through the government's

23   discovery to the extent that we can.  So I don't think we're

24   setting up a situation where we're going to have violence.  I

25   think we're just setting up a situation where he is more able

1   to defend himself, easier for his lawyers to see him, easier

2   for his lawyers to spend time with him and spend time going

3   through the extensive discovery that we've gotten and will be

4   getting on the computer and preparing this case for trial.  I

5   mean --

6              THE COURT:  All right.

7              MR. AGNIFILO:  Thank you, Judge.

8              THE COURT:  Is there anything you would like to say

9   about any of this, ma'am?

10              MS. PENZA:  Your Honor, only if you have any

11   questions, I believe our submission was fairly extensive.

12              THE COURT:  Well, you're concerned about the fact

13   that we don't know where this money is coming from and the

14   fact that people who have private jets can fly people wherever

15   they want to fly them and they don't necessarily have to have

16   travel documentation in order to do that, and we really don't

17   know whether in effect we're setting up a private jail here,

18   and does the Court have to start taking into account the fact

19   that what the Court may be sanctioning is in effect a private

20   jail with all the accoutrements of a mansion perhaps.  People

21   with a great deal of money can set up a private jail with all

22   kinds of amenities, then it sort of makes a mockery of the

23   system of justice, while other people can't get a hundred

24   dollars together to get out of Rikers Island.

25              I think this is a really big problem.  It's not just

1   a social problem, it's a criminal justice problem and I don't

2   know that I want contribute to it unless I know who is

3   providing the money and how much we're talking about.  If it's

4   going to be a hundred thousand dollars a month for private

5   gun-toting guards and placement in some sort of a home that I

6   don't know the nature of, then I'm a little bit concerned

7   about it, even apart from the issue of the possibility of

8   flight.

9          I'm concentrating on flight, but I think that if we

10  get past the issue of flight and we move on to some of these

11  other issues, I know that some courts have addressed these

12  other issues, I'd prefer not to have to do that, but does the

13  government have a position on all of that?

14         MS. PENZA:  Yes, Your Honor.  So, Your Honor, the

15  government absolutely believes that the private jail concept

16  has inherent problems, but this case in particular is a case

17  where it clearly is not the right outcome.  The only cases in

18  which this type of private jail has been allowed, which does

19  have enormous policy implications, have been cases in white

20  collar criminal cases where the defendants themselves were

21  putting up enormous sums of their own money.  And in this

22  situation, Your Honor, the defense counsel has given his best

23  guess as to who is financing the trust in this case --

24         THE COURT:  You mean he's given a guess?

25         MS. PENZA:  Yes, Your Honor.

1          THE COURT:  He doesn't know.

2          MS. PENZA:  He doesn't know.

3          THE COURT:  Let's put it this way, he hasn't

4    indicated that he knows.

5          MS. PENZA:  He hasn't indicated that he knows.  He

6    has indicated who he believes may be funding the trust.

7          MR. AGNIFILO:  I -- it's better that I guess.  I

8    mean, I don't know in that I've never seen the trust

9    documentation, but, you know, I'm -- I'm --

10         THE COURT:  When a surety comes in here I get to

11   question the surety.  I get to say, what is your relationship?

12   How do you know this person?  What's in it for you?  Are you

13   going to be able to cast moral suasion on this individual to

14   guarantee that this person is going to come back?  I get to do

15   that.

16         What your structure or the structure that's been

17   sort of devised eliminates is the role of the Court in making

18   a fair judgment as to whether if, by releasing someone,

19   they're likely to show up again in court absent, you know,

20   gunfire.  So I'm just concerned about that as much as I'm

21   concerned about anything else.

22         MR. AGNIFILO:  Just so Your Honor -- I didn't want

23   to interrupt the prosecutor.

24         THE COURT:  Continue.

25         MR. AGNIFILO:  Go ahead.

1          MS. PENZA:  So, Your Honor, the person who the

2    government believes, based on Mr. Agnifilo's guess --

3          THE COURT:  We've all guessed.  We've all read the

4    article in The New York Times magazine, all right.  I made a

5    promise in my life never to finish any article in The New York

6    Times magazine because they're all too long, but I made an

7    exception regarding this article.  I read the whole thing, so

8    I've read everything that was put forward there.

9          MS. PENZA:  All the way to my shoes, Your Honor.

10         THE COURT:  That's all I know about this case is

11   what I read in The New York Times magazine and the Albany

12   Times Union.  Okay?

13         MS. PENZA:  Understood, Your Honor.

14         THE COURT:  So that's the extent of my

15   understanding.  And so based on that, I could reach certain

16   guesses.

17         MS. PENZA:  Okay, so, Your Honor, based on that

18   guess, this is a person who the government does believe has

19   acted as a co-conspirator in criminal activity with the

20   defendant.

21         THE COURT:  Who has?

22         MS. PENZA:  The person who is funding this trust --

23         THE COURT:  Yes.

24         MS. PENZA:  -- has acted as a co-conspirator of the

25   defendant over many years.  And given that, and in addition to

1    the fact that over years she has given -- when we're talking

2    about amounts of money --

3            THE COURT:  He or she.

4            MS. PENZA:  Yes, Your Honor.  He or -- this person

5    on one occasion, just to give Your Honor an example, provided

6    a 65 million-dollar loan to the defendant for the commodities

7    market, which then all of that money was lost and has never

8    been repaid.  So this is the type of amounts of money.  It is

9    really unimaginable wealth and limitless wealth that we're

10   talking about here.  So the idea that any amount of money

11   would not be worth it to this person to allow the defendant to

12   flee, should we end up in that situation, is unimaginable.

13           And she -- this person, is also somebody who, Your

14   Honor, is equally capable along with the defendant of trying

15   to live off the grid.  We're talking about people with private

16   islands, talking about people with access to private air

17   travel, which the defendant has participated in.  People who

18   have also been using encrypted email.  People who have also

19   been dropping their phones so that the government is unable to

20   track them.  So this is the environment we're operating in,

21   Your Honor, and so we do believe that the risk of flight is

22   significant in this case.  But, Your Honor, we also believe

23   that this, unlike many cases in which private jails have been

24   proposed, is a case where there is real danger to witnesses,

25   to victims if the defendant is released.

```
1              This is somebody who has a network operating around
2    the world that literally one text message he can mobilize
3    hundreds of people who could do his bidding and so that, with
4    all due respect to Mr. Sullivan, there is nothing that
5    Mr. Sullivan is going to be able to do on a day in, day out
6    basis to prevent something like that from happening, Your
7    Honor, and people are truly petrified of the defendant.  This
8    is an organization that has operated for years by manipulating
9    people, by abusing people and by intimidating them.
10             THE COURT:  Anything else before I rule?
11             MR. AGNIFILO:  Yes.  So we have spoken about this
12   and Your Honor's right, Your Honor's suspicion of who is
13   funding the trust, whether that's a hundred percent or
14   99.5 percent, that's exactly what it is.
15             THE COURT:  My suspicion is not a suspicion, I'm
16   just saying that in the ordinary course sureties come before
17   the Court and explain what their relationship is with a
18   defendant and attempt to give the Court some assurance that as
19   a surety they are doing so voluntarily, that they have a
20   relationship, that they will do everything they can to oversee
21   the defendant's behavior to the extent that the defendant will
22   return to court, and provide that sort of assurance or group
23   of assurances so the Court can feel that there is a strong
24   likelihood that the person will not abscond, among other
25   things.
```

1          MR. AGNIFILO:  I understand.  I understand the

2     Court's concern completely.  I can absolutely attempt to make

3     that happen.  I don't control this person, this person has her

4     own lawyers, but Your Honor's concern is very well taken by

5     me.  I hear the Court loud and clear and if that's something

6     that --

7          THE COURT:  But then there is this other issue

8     that's raised obliquely by the government that this supposed

9     financial backer of this irrevocable trust may be either an

10    unindicted co-conspirator or subsequently an indicted

11    co-conspirator with the defendant, where are we then?  That

12    complicates the analysis substantially it would seem to me.

13         MR. AGNIFILO:  It would complicate it in one regard,

14    I don't think there's any suggestion that this person's

15    money -- we know who we're talking about and her money is

16    inherited, is not ill-gotten gains, so I don't think there is

17    a fear that --

18         THE COURT:  I'm not talking about money that -- this

19    isn't an organized crime case, all right, where the money was

20    the result of illegal activity, I would assume based on what's

21    believed by everybody in this room as to the source, but there

22    is the issue of the fact that if one party, one defendant is

23    supporting another defendant financially, then that raises

24    other issues, wouldn't you say?

25         MR. AGNIFILO:  I agree.  I agree.  But as we sit

```
 1    here today, there has been no charge --

 2              THE COURT:  Right.

 3              MR. AGNIFILO:  And --

 4              THE COURT:  Okay.

 5              MR. AGNIFILO:  -- the money is clean money.

 6              THE COURT:  I understand.

 7              MR. AGNIFILO:  I understand.

 8              THE COURT:  I'm just putting that on the table for

 9    you to chew on it.

10              MR. AGNIFILO:  I appreciate that.  I am chewing.

11              THE COURT:  Good.  Anything else?  That's it?

12              MR. AGNIFILO:  That's it for me.

13              THE COURT:  All right.  The defendant, Keith

14    Raniere, has been charged with sex trafficking, conspiracy to

15    commit sex trafficking, and conspiracy to cause another to

16    engage in forced labor.  The defendant has moved for release

17    on bail pending trial.  The Court finds that the government

18    has shown that the defendant is a flight risk, notwithstanding

19    the proposed conditions.  The Court, therefore, denies the

20    defendant's motion without prejudice.

21              Pretrial detainees have a right to bail under both

22    the Eighth Amendment and the Bail Reform Act.  The latter

23    provides that a court must release a defendant, quote, subject

24    to the least restrictive further condition, or a combination

25    of conditions, that it determines will reasonably assure the
```

1    appearance of the person as required, the safety of other

2    persons, and the community, end quote.  Only if, after

3    considering the factors set forth in Title 18 United States

4    Code Section 1342(g), the Court determines that, quote, no

5    condition or combination of conditions will reasonably assure

6    the appearance of the person as required and the safety of any

7    other person and the community, end quote, may the order --

8    the Court order the defendant to be held without bail.  If,

9    however, there is probable cause to find that the defendant

10   committed one of the offenses enumerated by the Bail Reform

11   Act, a rebuttable resumption arises, quote, that no condition

12   or combination of conditions will reasonably assure, end

13   quote, the defendant's appearance or the safety of the

14   community or others.  In such a case, quote, the defendant

15   bears a limited burden of production to rebut that presumption

16   by coming forward with evidence that he does not pose a danger

17   to the community or a risk of flight, end quote.  *United*

18   *States v. English*, 629 F.3d. 311, Second Circuit, 2011.

19        If the defendant offers such evidence, the

20   presumption favoring detention does not fall away, but, quote,

21   remains a factor to be considered among those weighed by the

22   district court, end quote.  Even if such a presumption case,

23   however, quote, the government retains the ultimate burden of

24   persuasion by clear and convincing evidence that the defendant

25   presents a danger to the community, and by the lesser standard

1    of preponderance of the evidence that the defendant presents a

2    risk of flight, end quote.  Quoting *United States v. English*.

3         The parties agree that this is a presumption case;

4    isn't that right?

5              MR. AGNIFILO:  That's correct, Judge.

6              THE COURT:  Right?

7              MS. PENZA:  Yes, Your Honor.

8              THE COURT:  The defendant has been indicted by a

9    federal grand jury on sex trafficking and sex-trafficking

10   conspiracy charges for which the maximum sentence is life in

11   prison.  The grand jury's indictment conclusively establishes

12   that there is probable cause to believe that the defendant

13   committed these offenses.  The only questions before the

14   Court, then, are whether the defendant has rebutted the

15   presumption in favor of detention, quote, by coming forward

16   with evidence that he does not pose a danger to the community

17   or a risk of flight, end quote.  Quoting, again the *English*

18   case, and whether the government has shown that the defendant

19   is dangerous or a flight risk notwithstanding the proposed

20   conditions.

21        The defendant has presented the Court with a bail

22   package that includes a number of conditions of release.

23   These proposed conditions include a 10 million-dollar

24   appearance bond; travel restrictions; home detention enforced

25   by GPS monitoring and round-the-clock armed guards; and

1    restrictions on defendant's access to computers and phones and

2    contact with his co-defendant, alleged co-conspirators, and

3    other Nxivm affiliates.

4         The government contends that this bail package is

5    insufficient to reasonably assure the defendant's appearance

6    at trial, to protect the safety of the community, or to

7    mitigate the risk that he will obstruct justice.

8         After considering the four Section 3142(g) factors,

9    the Court agrees with the government that the proposed bail

10   package is inadequate to reasonably assure the defendant's

11   appearance at trial.  In the Court's view, all four of these

12   factors, the nature and circumstances of the offense charged,

13   the weight of the evidence against the defendant, the history

14   and characteristics of the defendant, and the nature and

15   seriousness of the danger to any person or the community that

16   would be posed by the defendant's release, weigh in favor of

17   continued detention.  As the Court will explain, the first and

18   third of these factors particularly support continued

19   detention.

20        First, as to the nature and circumstances of the

21   offenses charged, the Court notes that the charges on which

22   the defendant has been indicted are extremely serious.  The

23   sex trafficking and sex-trafficking conspiracy charges are

24   each punishable by a sentence of life imprisonment, and the

25   forced labor conspiracy charge is punishable by up to 20 years

1    imprisonment.  Because the defendant is charged with sex

2    trafficking by, quote, force, threat of force, fraud, or

3    coercion, end quote, the substantive sex trafficking charge is

4    also subject to a 15-year minimum sentence under Title 18

5    United States Code Section 1591(b)(1).  Faced with the

6    possibility that, if convicted, he may spend the rest of his

7    life in prison, the defendant clearly has, quote, a strong

8    motive to flee, end quote.  *United States v. Sabhnani*, 493

9    F.3d 63, Second Circuit, 2007.

10           Second, as to the defendant's history and

11   characteristics, the Court finds that this factor strongly

12   supports detention to avoid the risk of flight.  Certain

13   aspects of the defendant's history and characteristics support

14   his pretrial release.  He is a long-time resident of upstate

15   New York, and there is no indication that he has a criminal

16   record, a substance abuse problem, or a history of missed

17   court appearances.  The Court is troubled, however, that

18   defendant's conduct in recent months, his lack of an ordinary

19   job or personal financial resources that could secure a

20   meaningful bond, and his access to third parties' extensive

21   financial resources all show that he may flee if given the

22   opportunity.

23           The Court is troubled by indications in the record

24   that the defendant attempted to allude law enforcement by

25   moving to Mexico last fall.  According to the government,

1   once, quote, law enforcement began interviewing witnesses

2   about defendant's criminal conduct, end quote, he fled to

3   Puerto Vallarta, Mexico, where he lived in a luxury villa,

4   began using fully encrypted email, and stopped using his

5   phone.

6           In response, defendant argues that he traveled to

7   Mexico to be with his child and his child's mother, a Mexican

8   citizen whose U.S. visa expired last October.  While he admits

9   he used different phones and email addresses, he contends that

10  he did so not to evade law enforcement but to evade

11  anti-Nxivm -- an anti-Nxivm group that he says harassed him

12  for years.

13          Finally, defendant contends that the government was

14  or should have been aware of his location because he filed a

15  document in state court resigning as executor of the estate of

16  his deceased significant other.  That document identified by

17  name and location the Mexican notary before whom defendant

18  appeared, which he argues shows that authorities knew his

19  location.

20          Defendant's explanations are not persuasive.  Even

21  if the Court were to accept defendant's explanation for why he

22  traveled to Mexico, this explanation would not give the

23  Court -- I'm sorry, would still give the Court pause as it

24  would indicate that the defendant has close personal ties to

25  Mexico and thus may be a flight risk.  In any event, this

1  explanation rings false, as defendant's motion indicates that

2  the mother of his child lives in or near Monterrey, but

3  Monterrey is hundreds of miles from Puerto Vallarta.  The

4  Court is skeptical of defendant's explanation that he began

5  using fully encrypted email and stopped using his phone to

6  evade Nxivm critics, not law enforcement, as the Court is not

7  aware how the former could have the ability to track his

8  phone.  Nor is the Court persuaded by defendant's argument

9  that his filing of the executorship document in state court

10  indicates that he did not attempt to conceal his location from

11  the government.  The document states that the Mexican notary

12  before whom he appeared was located in Guadalajara, Jalisco.

13  According to Google Maps, Guadalajara is about a five-hour

14  drive from Puerto Vallarta.  The Court does not see how the

15  government should have inferred this location from this

16  document.

17       The Court also has grave concerns about the

18  defendant's financial resources.  According to defendant's

19  financial affidavit, he is self-employed and has no income and

20  no assets other than a 50 percent interest in a home in

21  Clifton Park, New York, worth approximately $60,000.  He thus

22  has nothing material tying him to this district, or this state

23  beyond his half interest in the Clifton Park, New York real

24  estate.  On the other hand, defendant appears to have access

25  to enormous financial resources contributed by third parties.

1    According to the government, these resources include millions

2    of dollars as well as access to private air travel and to a

3    third party's private island in Fiji.  Defendant himself

4    proposes that he should be subject to home detention,

5    monitored by armed guards at the cost of at least $40,000, and

6    possibly more like $140,000 per month, to be paid through a

7    special trust funded by third-party contributors.  This access

8    to third parties' extensive financial resources exacerbates

9    the Court's concern that the defendant might attempt to

10   abscond if given the opportunity to do so.

11          Nor do defendant's proposed conditions of release

12   cure these concerns.  Defendant proposes release on a

13   $10 million bond, but this Court views this bond as basically

14   worthless, in light of defendant's lack of personal assets.

15   To cure this defect, defendant proposes that he should be

16   monitored by armed guards.  At this point, however, the Court

17   is not satisfied that the armed guard condition is a

18   reasonable alternative to pretrial detention.

19          First, the Court does not yet understand how

20   defendant intends to pay for the cost of private security.

21   The defendant cryptically avers that the guards will be paid,

22   quote, by an irrevocable trust funded by third-party

23   contributors to pay for reasonable defense costs in connection

24   with the instant prosecution, end quote.  What the Court does

25   not have in front of it, however, is any information about the

1   trust; its detailed terms; its corpus; or its settlors.

2   Without such information, the Court cannot make a reasoned

3   assessment of the armed guards' ability to assure defendant's

4   appearance.

5          The Court, likewise, has in number of questions

6   about who would be guarding the defendant and their ability to

7   prevent him from fleeing.  How, for example, was TorchStone

8   selected as the proposed security company?  Who does

9   TorchStone employ as guards, and what sort of background check

10   and security screenings are these guards subject to?  While

11   the Court has no intention of impugning TorchStone's or its

12   employees' integrity by asking these questions, it is

13   concerned that without a great deal more of information it

14   cannot make an informed assessment of these guards' ability to

15   prevent the defendant from fleeing.

16          And I might add, that the Court really isn't in a

17   position to be assessing law enforcement techniques and the

18   qualifications of law enforcement officers.  We have law

19   enforcement officers who work for the government and, with all

20   due respect to retired law enforcement officers, I don't think

21   that it's the job of the Court to be micromanaging the

22   activities of law enforcement or replacements for law

23   enforcement.  And this is particularly true here where the

24   defendant may have both access to extraordinary financial

25   resources and a number of loyal adherents, which could easily

1    facilitate his escape at some point.

2              For the aforementioned reasons, the Court concludes

3    that the proposed conditions of release are insufficient to

4    reasonably assure the defendant's appearance at trial.  The

5    Court therefore denies the defendant's motion for bail.  This

6    denial is, however, without prejudice to the refiling of a

7    revised bail package that provides greater transparency about

8    the defendant's access to financial resources and the proposed

9    terms of his home detention and armed guards.  Because the

10   Court determines that the government has shown that these

11   conditions are insufficient to reasonably assure the

12   defendant's appearance, the Court need not consider at this

13   time whether the government also has shown that these

14   conditions are insufficient to protect the community and

15   others.

16             So the application is denied without prejudice.  And

17   you understand what the concerns of the Court are.

18             MR. AGNIFILO:  Very much so, thank you.

19             THE COURT:  All right.  Is there anything else from

20   the government today?

21             MS. PENZA:  No, Your Honor, thank you.

22             THE COURT:  All right.

23             Now with respect to the government, if for any

24   reason we require a meeting before, I think it's the 25th --

25             MS. PENZA:  Yes, Your Honor.

```
1              THE COURT:  -- of July, please give adequate notice

2    to both of the defendants, because I'm requiring that the

3    defendants appear including Ms. Mack at every status

4    conference.

5              MS. PENZA:  Understood, Your Honor.

6              THE COURT:  All right.

7              MS. PENZA:  Thank you.

8              THE COURT:  That's your obligation to keep them

9    informed so that they can give Ms. Mack adequate time to get

10   here, because that's the requirement of this Court in this

11   very significant case.

12             MS. PENZA:  Absolutely, Your Honor.

13             THE COURT:  Got it?

14             MS. PENZA:  Yes.

15             THE COURT:  Is there anything else from you, sir?

16             MR. BUCKLEY:  No, thank you, Your Honor.

17             THE COURT:  Anything else from you, sir?

18             MR. AGNIFILO:  No, thank you, Your Honor.

19             THE COURT:  All right.  We're adjourned.

20             (Matter concluded.)

21                      *    *    *    *    *

22   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
23

24   s/ Georgette K. Betts              June 13, 2018

25   GEORGETTE K. BETTS                 DATE
```

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter