MKM:MKP/TH/MJL/KMT
F. #2017R01840

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

      - against -

KEITH RANIERE,
CLARE BRONFMAN,
ALLISON MACK,
KATHY RUSSELL,
LAUREN SALZMAN and
NANCY SALZMAN,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No. 18-204 (S-1) (NGG) (VNS)


MEMORANDUM OF LAW IN SUPPORT OF THE
GOVERNMENT'S MOTION TO ADMIT CERTAIN RACKETEERING EVIDENCE


RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201


Moira Kim Penza
Tanya Hajjar
Mark J. Lesko
Kevin Trowel
Assistant U.S. Attorneys
    (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................1

I.    The Charged Enterprise...................................................................................2

II.   The Charged Offenses.....................................................................................3

    A.    Conspiracy to Commit Identity Theft and to Unlawfully Possess a False
          Identification Document (RA 1) ................................................................3

    B.    Conspiracy to Commit Identity Theft (RAs 2 and 4) ................................3

    C.    Conspiracy to Alter Records for Use in an Official Proceeding  (RA 3) ....4

    D.    Encouraging Illegal Entry and Money Laundering (RA 5) ........................4

    E.    Forced Labor of Jane Doe 4 (RA 6) ..........................................................4

    F.    State Law Extortion, Sex Trafficking, and Forced Labor (RAs 7 – 10,
          Counts Two – Six)....................................................................................5

    G.    Conspiracy to Commit Identity Theft (RA 10, Count Seven) ...................6

ARGUMENT.............................................................................................................6

I.    Legal Standard ...............................................................................................8

    A.    Government's Burden of Proof...................................................................8

    B.    Enterprise Evidence is Admissible as Direct Evidence to Establish the
          Existence of the Charged Enterprise and a Pattern of Racketeering .........10

    C.    Second Circuit's "Inclusionary" 404(b) Standard....................................14

II.   Admissibility of Categories of Evidence as Direct Proof of Racketeering
      Conspiracy and Otherwise ............................................................................15

    A.    Evidence Relating To Consumers Buyline, Inc. ("CBI").........................15

          i.    Facts .............................................................................................15

          ii.   Admissibility .................................................................................16

    B.    Nxivm's Teachings and Practices ............................................................17

          i.    Facts .............................................................................................17

          ii.   Admissibility .................................................................................20

    C.    Cash Smuggling, Structuring, and Tax Evasion ......................................22

          i.    Facts .............................................................................................22

          ii.   Admissibility .................................................................................23

    D.    Campaign Contribution Evidence ............................................................24

                 i.       Facts ................................................................................24

                 ii.      Admissibility ...................................................................25

      E.      Recruitment of Non-Citizens and Immigration Fraud.............................26

                 i.       Facts ................................................................................26

                 ii.      Admissibility ...................................................................27

      F.      Evidence of the Recruitment and Grooming of Sexual Partners for Raniere

           ...............................................................................................28

                 i.       Facts ................................................................................28

                 ii.      Admissibility ...................................................................29

      G.     Surveillance and Harassment of Nxivm Enemies .................................32

                 i.       Facts ................................................................................32

                 ii.      Admissibility ...................................................................33

      H.     Abusive Litigation and Obstruction Evidence ........................................34

                 i.       Facts ................................................................................34

                 ii.      Admissibility ...................................................................35

      I.       Conduct After DOS was Exposed .........................................................36

                 i.       Facts ................................................................................36

                 ii.      Admissibility ...................................................................38

  III.     None of the Proffered Evidence is Unfairly Prejudicial ......................................39

CONCLUSION......................................................................................................40

PRELIMINARY STATEMENT

The government respectfully submits this motion in limine to admit certain evidence at trial of uncharged criminal and other acts committed by the defendants and other conspirators.   As set forth below, the evidence is admissible as direct proof of the existence of the Enterprise as set forth in the Superseding Indictment (the "Indictment"), the relatedness of the defendants' acts within the racketeering pattern, and the defendants' membership and ongoing participation in the Enterprise's illegal activities.  Such evidence is particularly critical in light of the defendants' pretrial challenges to the sufficiency of the government's evidence on these points.  (See, e.g., DEs 192-199.)  In the alternative, the evidence is admissible as "other crimes, wrongs or acts" under Rule 404(b) of the Federal Rules of Evidence because it tends to establish the defendants' knowledge and intent with respect to the charged crimes and is probative of the issues of planning, preparation and absence of mistake with respect to the conspiracy and substantive counts in the Indictment.[1]

BACKGROUND

On July 23, 2018, a federal grand jury in the Eastern District of New York returned a superseding indictment charging the defendants with participating in a long-running racketeering conspiracy, among other crimes.  The charges relate to the defendants' involvement in several hierarchical pyramid-structured organizations (the "Pyramid Organizations") founded

---

[1]    The government reserves the right to make additional motions, including motions to cross-examine defendants and other witnesses under Rules 608(b) and 609, and additional motions that may become appropriate following the disclosure of certain witnesses' 18 U.S.C. § 3500 material.  Moreover, this motion does not purport to set forth all evidence that will be introduced as to specified racketeering acts or charged counts.

1

by Raniere, including Nxivm and various related entities that purported to offer "self-help workshops," as well as an organization referred to as "DOS," which purported to be a "women's empowerment" group.  (DE 4 at 2; DE 14 at 1.)  The government notes the Court's familiarity with the facts of this case and incorporates by reference its description of the charges underlying the Indictment set forth in its Memorandum of Law in Response to Defendants' Pretrial Motions, dated December 17, 2018.  (DE 248 at 3-7.)

I.    The Charged Enterprise

As alleged in the Indictment, the Enterprise was an association-in-fact composed of Keith Raniere and an "inner circle" of individuals, including the other defendants, who were "accorded special positions of trust and privilege" with Raniere and who "carried out his directives."  (Indictment, DE 50, at ¶ 1-3.)  The principal purpose of the Enterprise was to obtain financial and personal benefits for the members of the Enterprise by promoting Raniere and by recruiting new members into the Pyramid Organizations, including Nxivm and DOS.  (Id. ¶ 4.)  By promoting Raniere and recruiting others, members of the Enterprise expected to receive financial opportunities and increased power and status within the Enterprise.  (Id.)  The members of the Enterprise carried out its principal purpose by, among other things, the means and methods set forth in the Indictment.  (Id. ¶ 4.)

The evidence at trial will demonstrate that the primary functions of the Enterprise were to (1) recruit other individuals to work in one or more of the Pyramid Organizations and, at times, to serve as sexual partners for Raniere; (2) protect the Enterprise by, among other things, surveilling and attacking perceived enemies of Raniere and Nxivm;  and (3) promoting the Enterprise through efforts to gain influence and power.  Members of the Enterprise, including the

defendants, generally held high positions in Nxivm, its affiliated organizations, and/or in DOS, and at all times, Raniere was the leader of Nxivm and DOS.  (Id. ¶¶ 7-13.)

II.  The Charged Offenses

Count One charges the defendants with conspiring to participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity, specifying certain predicate racketeering acts, in violation of Title 18, United States Code, Section 1962(d).  Counts Two through Seven charge various substantive offenses.  These are described below.

A.    Conspiracy to Commit Identity Theft and to Unlawfully Possess a False Identification Document (RA 1)

Racketeering Act One alleges a conspiracy to commit identity theft and to unlawfully possess a false identification document as to Jane Doe 1.  This racketeering act arises out of a scheme by defendants and co-conspirators, including Raniere and Russell, to bring Jane Doe 4, a Mexican citizen who was in a sexual relationship with Raniere, into the United States unlawfully by providing her with a false identification document.

B.    Conspiracy to Commit Identity Theft (RAs 2 and 4)

Racketeering Acts Two and Four allege conspiracies to commit identity theft as to John Does 1 and 2 and Jane Doe 2, respectively.  These racketeering acts arise out of schemes by defendants and co-conspirators, including Raniere, Bronfman, Russell and Nancy Salzman, to obtain passwords and monitor the email accounts belonging to these individuals.  Defendants and co-conspirators believed John Doe 1 and John Doe 2, ▮▮▮▮▮▮▮▮▮, were participants in a large-scale plot to destroy Raniere and Nxivm.  Attempts to monitor accounts belonging to Jane Doe 2, who was in a sexual relationship with Raniere, were to ensure her loyalty to Raniere.

3

C.     <u>Conspiracy to Alter Records for Use in an Official Proceeding</u>
         <u>(RA 3)</u>

         Racketeering Act Three alleges a conspiracy to alter records for use in an official

proceeding.  This racketeering act arises out of a scheme by defendants and co-conspirators,

including Raniere and Nancy Salzman, to alter material that was to be produced in discovery in a

civil lawsuit.  Defendants initiated the lawsuit against a former Nxivm student, Rick Ross and

others after Ross, creator of the "Rick A. Ross Institute for the Study of Destructive Cults,

Controversial Groups, and Movements" published materials critical of Nxivm's practices online.

These materials included reports from forensic psychiatrists that analyzed Nxivm's course

materials.

D.     <u>Encouraging Illegal Entry and Money Laundering (RA 5)</u>

         Racketeering Act Five alleges a conspiracy to encourage and induce the illegal

entry of an alien for financial gain and money laundering.  This racketeering act arises out of a

scheme by defendants and co-conspirators, including Bronfman, to obtain an investor visa for

Jane Doe 3, ▮▮▮▮▮▮▮▮▮▮▮▮ to work in the United States, by making it falsely

appear as if Jane Doe 3 had the funds to qualify for an investor visa, when in fact she did not.

Defendants and co-conspirators sought to bring Jane Doe 3 to Albany, New York in order to

recruit and maintain Jane Doe 3 in the Pyramid Organizations, including a Nxivm-affiliated

entity.  Jane Doe 3 was also eventually recruited into DOS.

E.     <u>Forced Labor of Jane Doe 4 (RA 6)</u>

         Racketeering Act Six alleges the trafficking of Jane Doe 4 for labor and services

and document servitude as to Jane Doe 4.  This racketeering act arises out of the confinement of

Jane Doe 4 by defendants and co-conspirators, including Raniere and Lauren Salzman, to a room

for nearly two years, because of Jane Doe 4's commission of a purported "ethical breach."

Defendants and co-conspirators shunned and then confined Jane Doe 4 after she told Raniere that

she had developed romantic feelings for another man.  Jane Doe 4, who had been brought into

the country illegally by defendants and co-conspirators, was told that if she left the room, she

would be sent back to Mexico.  While in the room, Jane Doe 4 spent months without human

contact and was denied medical care.  When she left the room she was—as threatened—driven to

Mexico at Raniere's direction by co-conspirators and defendants and co-conspirators instructed

her family to tell her that unless she completed certain work for Raniere's benefit, she would not

receive identification documents that she needed, including her birth certificate.

    F.      <u>State Law Extortion, Sex Trafficking, and Forced Labor (RAs 7 – 10, Counts Two<br>          – Six)</u>

Racketeering Acts Seven through Ten and Counts Two through Six relate to the

defendants' and co-conspirators' participation in "DOS," and include acts and charges involving,

variously, extortion, wire fraud conspiracy, sex trafficking, attempted sex trafficking, sex

trafficking conspiracy and forced labor conspiracy.  DOS was a Raniere-led pyramid

organization comprised of lines of "masters" who recruited and commanded groups of "slaves."

DOS masters recruited "slaves," including Jane Does 5, 6, and 8, by falsely describing it as a

secret women's empowerment group and concealing Raniere's participation and leadership.

Prospective "slaves" were required to provide "collateral"—including damaging confessions

about themselves and loved ones (truthful or not), rights to financial assets, and sexually explicit

photographs and videos—to prevent them from leaving the group or disclosing it to others.

After joining DOS, "slaves" were required to provide additional collateral,

including sexually explicit photographs, and to pay "tribute" to their masters, including by

performing tasks that would otherwise be compensable. In addition, several DOS "slaves" were directed to have sex with Raniere.

     G.    <u>Conspiracy to Commit Identity Theft (RA 10, Count Seven)</u>

        Racketeering Act Ten alleges and Count Seven charges conspiracy to commit identity theft. This racketeering act and substantive count arise out of a scheme in which defendants and co-conspirators, including Bronfman and Raniere, facilitated Raniere's use of a credit card that had belonged to Jane Doe 7 after her death. This scheme was part of a long-standing practice of defendants and co-conspirators to keep all money and assets out of Raniere's name. Bronfman facilitated the scheme by arranging for payment of Jane Doe 7's credit card bill. At trial, the government will introduce evidence demonstrating that defendants and co-conspirators kept money out of Raniere's name to allow him to avoid paying taxes and to make him judgment proof.

ARGUMENT

        In the defendants' pretrial briefing and arguments to the Court, they have repeatedly sought to challenge the sufficiency of the evidence of the racketeering conspiracy generally, and not simply the sufficiency of the evidence as to each each defendant's participation in the conspiracy. For example, certain defendants have claimed that the "purported RICO conspiracy is nonsense" and "a fiction concocted by the government to, among other things, avoid serious statute of limitations problems and force all the Defendants into a highly prejudicial joint trial." <u>See, e.g.</u>, Memorandum of Law in Support of Motion to Dismiss by Bronfman, Kathy Russell and Nancy Salzman (DE 194) at 9.

        Specifically, certain defendants have challenged the existence of the alleged enterprise. They claim, for example, that they cannot be part of the association-in-fact as

6

charged because three of the defendants were not members of DOS.  See id. at 6.  The defendants have also indicated that they will defend the allegations underlying the racketeering predicates by asserting that purpose of their association was entirely lawful.  See, e.g., id.

Moreover, the defendants have made clear that they intend to attack the credibility of cooperating witnesses who will testify and provide crucial testimony about the existence of the Enterprise.  For example, Raniere has stated "with respect to the racketeering conspiracy, as the Court will soon see, the conspiracy was predicated mainly on the acts of the cooperating witness in this case and a Mexican national" and that Raniere "was not involved in these two unindicted co-conspirators' schemes."  See Raniere's Third Bail Motion (DE 303) at 23.

The defendants have also attacked the allegations regarding the pattern requirement by claiming deficiencies in vertical and horizontal relatedness.  Ignoring the government's definition of the Enterprise as an association-in-fact involving Raniere and his "inner circle," the defendants have attempted to conflate the Enterprise with Nxivm and DOS, and to create a false dichotomy between the "DOS Acts" and "DOS Defendants" and the "Non-DOS Acts" and "Non-DOS Defendants."  See id. (claiming that the "most glaring deficiency in the charged pattern is vertical relatedness, as the Indictment is devoid of allegations showing a nexus between the predicate acts and the enterprise" and stating, as to horizontal relatedness, the "DOS Acts and Non-DOS Acts are clearly unrelated . . . [t]he indictment pleads no facts showing that they resemble each other in any relevant respect").  The defendant Raniere went so far as to take the government's alleged means and methods, claimed that each "appear[ed] to be related to DOS or to Nxivm, but never to both" and then identified the organization (Nxivm or DOS) he believed the government intended to correspond to each.  Memorandum of Law in Support of Raniere's Motion to Dismiss (DE 269) at 11.

7

In light of the arguments made in the defendants' pretrial motions, the government anticipates that the existence of the alleged agreed-upon enterprise and a pattern of agree-upon racketeering acts will be central issues at trial. Accordingly, at trial the government intends to offer evidence, detailed below, of uncharged crimes and other acts that are direct proof of the racketeering conspiracy and substantive conspiracies charged in the Indictment or are inextricably intertwined with those conspiracies. As described below, the majority of this evidence therefore does not comprise "crime[s], wrong[s], or other act[s]" subject to Federal Rule of Evidence 404(b). Nevertheless, even if it were to constitute such evidence, the "other act" evidence is admissible under Rule 404(b) to show knowledge, intent, motive, plan, preparation, identity, absence of mistake, and lack of accident, and to provide background of the conspiracy, explain the relationship of trust between the coconspirators, complete the story of the charged crimes, and corroborate the testimony of the victims and witnesses at trial. Finally, all of the evidence identified below passes Rule 403's balancing test.

I.    Legal Standard

A.    Government's Burden of Proof

A charge of racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), requires the government to prove—among other things—that a defendant conspired to conduct an "enterprise's affairs through a pattern of racketeering activity." The government need not prove that the defendant agreed to commit any charged predicate acts, "as long as the government proves that he participated in some manner in the overall objective of the conspiracy." See also United States v. Yanotti, 541 F.3d 112, 129 n.11 (2d Cir. 2008).

The "enterprise" requirement may be satisfied by proving that the alleged association is one including individuals "associated in fact although not a legal entity." 18 U.S.C.

§ 1961(4).  In order to prove that an association-in-fact was an enterprise, the government must show that the association-in-fact had "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Boyle v. United States, 556 U.S. 938, 946 (2009).  In other words, it is "'succinctly . . . a group of persons associated together for a common purpose of engaging in a course of conduct.'" Id. (quoting United States v. Turkette, 452 U.S. 576, 583 (1981)).

To prove the "pattern" requirement the government "'must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity.'" United States v. Ashburn, 11-CR-303 (NGG), 2015 WL 5098607, at *18–19 (E.D.N.Y. Aug. 31, 2015) (quoting H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239, (1989)). "Racketeering predicates are 'related' when they have 'the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" Id. (citing United States v. Payne, 591 F.3d 46, 64 (2d Cir.2010)); see also United States v. Daidone, 471 F.3d 371, 375 (2d Cir. 2006) (describing the list above as a "guidepost . . . for the relatedness inquiry").

In the Second Circuit, relatedness requires that predicate acts "must be related to each other ("horizontal" relatedness), and they must be related to the enterprise ("vertical" relatedness)." Id. (internal quotations omitted).  One way of satisfying "both the vertical and horizontal relationships" is to link "each predicate act to the enterprise." Id. at 376.  "This is because predicate crimes will share common goals . . . and common victims . . . and will draw their participants from the same pool of associates." Id.  Furthermore, "[e]vidence of relatedness . . . may arise from facts external to the [charged] predicate acts, including the nature of the

RICO enterprise itself." United States v. Price, 443 F. App'x 576, 581 (2d Cir. 2011) (summary order) (second alteration in original).

The "means and methods" by which defendants and associates conducted the affairs of the Enterprise are relevant to proving both the existence of the Enterprise and the pattern requirement. See, e.g., United States v. Liburd, 17-CR-296 (PKC), 2019 WL 319392, at *7 (E.D.N.Y. Jan 24, 2019) (refusing to grant severance for defendant not charged in racketeering counts, noting that "[i]f severance were granted, the government would still need to present evidence relating to the robbery . . . in its racketeering case against the other defendants, because the racketeering charges . . . are supported by allegations that [the defendant] was a member of the enterprise and that the enterprise used robbery as one its 'means and methods'"). For example, in United States v. Scarpa, 913 F.2d 993, 1013 (2d Cir. 1990), the Second Circuit refused to strike portions of indictment referring to an organized crime family that was distinct from the charged enterprise because the allegations "serve[d] to identify the 'enterprise' and the means by which its members and associates conduct[ed] various criminal activities."

### B. Enterprise Evidence is Admissible as Direct Evidence to Establish the Existence of the Charged Enterprise and a Pattern of Racketeering

The Second Circuit has long upheld the admission of information about uncharged crimes and other acts in racketeering cases as direct evidence to establish an enterprise or a pattern of racketeering—two of the essential elements of racketeering. See, e.g., United States v. Baez, 349 F.3d 90, 93 (2d Cir. 2003) ("It is well settled that in prosecutions for racketeering offenses, the government may introduce evidence of uncharged offenses to establish the existence of the criminal enterprise"); Payne, 591 F.3d at 64 (quoting United States v. Diaz, 176 F.3d 52, 79 (2d Cir.1999) ("'Evidence of prior uncharged crimes and other bad acts that

10

were committed by defendants[ ]' may be 'relevant . . . to prove the existence, organization and nature of the RICO enterprise, and a pattern of racketeering activity by each defendant . . . .'"). Courts have upheld this principle even in cases where the government sought to admit violent uncharged acts, such as murders.  See, e.g., United States v. Matera, 489 F.3d 115, 120 (2d Cir. 2007) (upholding admission of uncharged murders committed by members of the Gambino Family even though only one of the defendants participated in those crimes as "consistent with numerous prior rulings of this court in which criminal acts of

non-defendants . . . were received to prove the existence of the criminal RICO enterprise in which the defendant participated.")

The Second Circuit repeatedly has held that evidence of uncharged crimes may be admitted at trial to establish the existence and evolution of a relationship of trust between coconspirators.  See, e.g., United States v. Williams, 205 F.3d 23, 33-34 (2d Cir. 2000) (upholding admission of evidence relating to the defendant's prior criminal activities with coconspirators as relevant evidence to inform jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed); United States v. Pipola, 83 F.3d 556, 565-66 (2d Cir. 1996) ("One legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case."); United States v. Rosa, 11 F.3d 315, 333-34 (2d Cir. 1993) (holding that codefendants' relationship over a 14-year period, during which stolen property and narcotics crimes were committed, "was properly admitted to explain how the illegal

11

relationship between the two [defendants] developed and to explain why [one defendant] . . . appointed [the other defendant] . . . to a leading position in the Organization").[2]

Uncharged crimes and other acts can also establish a pattern of racketeering activity, even if not all of the defendants (or even none of the defendants) participated in them. Such evidence "can prove the relatedness and continuity essential to a pattern, thereby helping to establish that the defendant's own acts constitute a pattern within the meaning of RICO." United States v. Basciano, 599 F.3d 184, 207 (2d Cir. 2010) (internal quotation marks omitted); id. at 207 n.17 (citing Gerard E. Lynch, RICO: The Crime of Being a Criminal, Parts III & IV, 87 Colum. L. Rev. 920, 944 (1987) (noting that the actions of others are admissible in a RICO case because the government must show that the defendants' acts were part of a pattern, "committed as part of defendant's association with a subculture of crime")); United States v. Coppola, 671 F.3d 220, 244-45 (2d Cir. 2012) ("Evidence of numerous criminal acts by a variety of persons may be relevant to prove the enterprise and pattern elements of racketeering . . . . Such conduct is not 'other' crime evidence subject to Fed. R. Evid. 404(b)." (alteration and internal quotation marks omitted)). Cf. United States v. Pizzonia, 577 F.3d 455, 465 (2d Cir. 2009) ("Although no

---

[2]        Evidence of trust between coconspirators can be admissible as direct evidence and under Rule 404(b). See, e.g., United States v. Moten, 564 F.2d 620, 628 (2d Cir. 1977) ("t of the conspiracy charged was clearly admissible to show the basis for the existence of the conspiracy charged and the mutual trust which existed between Brown and his customers. It was therefore admissible against all the defendants to show the nature and existence of the conspiracy charged."); United States v. Morillo-Vidal, 547 F. App'x 29, 30-31 (2d Cir. 2013) (testimony regarding other crimes was admissible because it was "relevant background information" that, inter alia, "explained [a co-conspirator's] relationship to his co-conspirator [] and his knowledge of [the co-conspirator's] role in a national drug conspiracy," evidence that qualifies as "highly probative when the charged conduct covers a conspiracy").

[fewer] than two predicate acts must be committed . . . to demonstrate a pattern of racketeering, in the end, it is not the number of predicates proved but, rather, the relationship that they bear to each other or to some external organizing principle that indicates whether they manifest the continuity required to prove a pattern." (internal citation and quotation marks omitted)).

Moreover, evidence that provides important background, is "inextricably intertwined," or is evidence of acts committed in furtherance of a conspiracy, does not implicate Rule 404(b); rather, such evidence is admissible as direct evidence of the crime.  See, e.g., United States v. Gonzalez, 110 F.3d 936, 941-42 (2d Cir. 1997) (affirming the admission of evidence of a burglary in a felon-in-possession case under Rule 401, without resorting to Rule 404(b), because it provided "crucial background" and gave "coherence to the basic sequence of events"); United States v. Thai, 29 F.3d 785, 812 (2d Cir. 1994) (explaining that an act done in furtherance of a RICO conspiracy is admissible under Rule 401 and is not an "other" act within the meaning of Rule 404(b) even if it is not charged within the indictment); United States v. Barret, No. 10-CR-809 (KAM), 2011 WL 6704862, at *4 (E.D.N.Y. Dec. 21, 2011) (observing that it is "settled in the Second Circuit that where an indictment contains a conspiracy charge, '[a]n act that is alleged to have been done in furtherance of the alleged conspiracy' is considered to be 'part of the very act charged.'" (quoting United States v. Diaz, 176 F.3d 52, 79 (2d Cir. 1999)).

"Relevance" under Rule 401 is a term designed to encompass a broad array of conduct, particularly in the context of a racketeering case.  The Second Circuit in Gonzalez noted that "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." 110 F.3d at 941.  Accordingly, "[r]elevant evidence is not confined to that which directly

establishes an element of the crime." Id.; see also Fed. R. Evid. 401, 402. In analyzing the admissibility of evidence, trial courts must make their determinations "with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case." Old Chief v. United States, 519 U.S. 172, 183 (1997).

      C.  Second Circuit's "Inclusionary" 404(b) Standard

      Where Rule 404(b) is implicated, evidence of uncharged crimes or other acts may be admitted for permissible purposes, including to prove motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident. Fed. R. Evid. 404(b)(2); see United States v. Ortiz, 857 F.2d 900, 903 (2d Cir. 1988).

      Rule 404(b) in the Second Circuit has broad reach because the court has applied an "inclusionary approach" to admitting "other acts" evidence. United States v. Garcia, 291 F.3d 127, 136 (2d Cir. 2002). See also United States v. Levy, 731 F.2d 997, 1002 (2d Cir. 1984) ("We have adopted the inclusionary or positive approach to [404(b)]; as long as the evidence is not offered to prove propensity, it is admissible.").

      A party must satisfy three requirements in order for evidence of "other crimes, wrongs or acts" to be admitted under the rule. First, the evidence must be offered for a purpose other than to prove a defendant's bad character or criminal propensity. United States v. Mickens, 926 F.2d 1323, 1328 (2d Cir. 1991). Second, the evidence must be relevant under Rules 401 and 402 and not run afoul of Rule 403. Id. And third, if the defendant requests that the jury be instructed as to the limited purpose for which the government's evidence is being admitted, the court must furnish such an instruction. Id. at 1328-29.

      Additional bases for admitting other acts evidence under Rule 404(b) include "corroborat[ing] crucial prosecution testimony," such as the testimony of cooperating witnesses,

if the corroboration is "direct and the matter corroborated is significant," United States v. Everett, 825 F.2d 658, 660 (2d Cir. 1987), and, where extensive cross-examination into a government witness's criminal history for impeachment purposes is anticipated, allowing the government to elicit the witness's testimony about such acts on direct examination so as to avoid the appearance that the government is concealing such purported impeachment evidence from the jury, see, e.g., United States v. Guerrero, 882 F. Supp. 2d 463, 492 (S.D.N.Y. 2011).

II.    Admissibility of Categories of Evidence as Direct Proof of Racketeering Conspiracy and Otherwise

A.    Evidence Relating To Consumers Buyline, Inc. ("CBI")

i.    Facts

In or about May 1990, Raniere founded CBI, a company headquartered in Clifton Park, New York, in the same location in which Nxivm later operated.  CBI operated by recruiting individuals, called Affiliates, to sell CBI memberships in order to receive income in the form of commissions from CBI membership fees.  In order to be eligible to receive commission payments, Affiliates were required to meet certain recruitment targets.  Affiliates earned commission payments from the monthly membership fees of members they sponsored, as well as from the membership fees of members recruited by those in their "affiliate team," resulting in a pyramid structure.  Eventually, CBI came under scrutiny by state attorneys-general and other regulators for operating as an illegal pyramid scheme.  CBI was forced to close in 1997 after a settlement with the New York Attorney General in which CBI agreed to pay $40,000.  At trial, the government will seek to introduce evidence relating to CBI, including its structure and operation, to demonstrate that Raniere and his co-conspirators used CBI as a model for Nxivm and that they hoped to replicate CBI's early financial success.  For example, in an email sent to

15

Nancy Salzman on November 15, 2007, a Nxivm member wrote, "I gave an intro[3] today for 24 people and we had 15 sign up.  We really need to grow staff faster.  I'm going to take a closer look to really understand multilevel marketing.  Getting ready for CBI part 2."  The government will also introduce evidence that Raniere was aware of unpaid tax liens and other judgments against him and CBI.

        ii.  <u>Admissibility</u>

The CBI Evidence, which is from the period immediately prior to the conspiracy alleged in the Indictment, is inextricably intertwined and provides necessary context for the racketeering conspiracy charged in this case because Raniere's role as the founder and leader of CBI and his role in CBI at the time of its closing explain the reason for and the timing of Raniere's and Nancy Salzman's founding of Nxivm.  See <u>United States v. Langford</u>, 990 F.2d 65, 70 (2d Cir. 1993) ("It is within the court's discretion to admit evidence of acts committed prior to the time charged in the indictment to prove the existence of the alleged conspiracy as well as to show its background and history.").

Moreover, Raniere's role in CBI, a multilevel marketing organization similar in structure to Nxivm and DOS, and his use of women as leaders and recruiters in CBI (some of whom are unindicted co-conspirators to the charged crimes) is also evidence of Raniere's knowledge of how to organize and operate a pyramid organization and the power and other

---

[3]    "Intros" were presentations with high-pressure sales tactics given by members of Nxivm in order to recruit attendees into Nxivm.

benefits that accrue to those on top of the pyramid; his modus operandi in operating pyramid organizations; and his intent (i.e., his lack of mistake) in structuring Nxivm and DOS as he did.

The CBI Evidence is also evidence of defendants' and co-conspirators' motive and intent in keeping affiliated companies and assets out of Raniere's name, i.e., in part to allow Raniere to avoid paying his past judgments from CBI's failure, to keep him judgment-proof in the future, to avoid the regulatory scrutiny of having companies in the name of someone who had been investigated.  The CBI Evidence is also evidence of Raniere's intent as to the racketeering conspiracy, because many of the Enterprise's means and methods and predicate acts were fueled by Raniere's paranoia that people were out to get him, which began with CBI's collapse.  For example, just as he believed that other companies conspired to bring down CBI, he believed that the victims of Racketeering Act Two and many others were conspiring to ruin Nxivm.

B.  Nxivm's Teachings and Practices

    i.  Facts

Nxivm and its affiliated organizations offered classes promising personal and professional development.  Because the classes were very expensive, the defendants and their co-conspirators encouraged Nxivm students who were unable to pay to commit to work "exchanges," or to make payments over time at rates that were often not made clear.  By working on "exchange," Nxivm students could work within the community to pay off their debt, but the defendants and their co-conspirators would often extract hundreds of hours of service in exchange for taking one class.  At trial, the government will prove that Nxivm recruits were often told that they owed money that they were unaware of, sometimes years after the debts supposedly accrued, or were not given a concrete accounting of the hours they needed to work in order to pay off their debts.  Individuals were pressured to take additional courses, leading to

17

further debt.  For instance, the government anticipates introducing evidence that one couple estimated that they spent three hundred thousand dollars on Nxivm courses and ultimately were forced to declare bankruptcy because of their debt.

Because of Nxivm's pyramid structure, the benefits accrued to those at the top of the pyramid.  For example, members of Nxivm were encouraged to recruit others to take Nxivm classes and were told that they could earn commissions on any sales they made.  Practically, however, the commissions on those sales generally went to the people above them on the pyramid, because in order to "earn" the right to keep commissions, members had to recruit people at a rate that was nearly impossible to maintain because of the prohibitive cost of the courses.  A second way of earning money was to attain a high enough rank on the "Stripe Path"[4] to qualify for certain careers within Nxivm, but to move up the Stripe Path, Nxivm members were obligated to take specific, expensive courses (the money for which went to the higher-ups on the pyramid) and expend significant additional funds teaching courses for free.

At trial, the government will seek to introduce evidence that several individuals took positions with Nxivm that defendants and co-conspirators told them would be lucrative but were paid little to no income.  At least one Nxivm employee that was contractually owed a specific monthly income was paid only a small fraction of what she was owed.  The defendants and their co-conspirators often told Nxivm members that they were not being given the money

---

[4]    As the Court is aware, the Stripe Path is a designation of hierarchy within Nxivm. Members wear different color sashes corresponding to their rank within the organization.  Each colored sash may have between 0 and 4 "stripes."  Once someone had earned four stripes he or she was eligible to move up to a different sash color.

they had been promised because of "issues" that affected their ability to advance within the community.  In order to cure these supposed issues, people were encouraged to engage in expensive therapy-like sessions referred to as "explorations of meaning" ("EMs") to address those issues, which generated even more money for the defendants and their co-conspirators.

The Nxivm teachings and practices, which the defendants and their co-conspirators created and promoted, were also designed to increase and maintain power and control over Nxivm members.  For example, the defendants and their coconspirators told members of Nxivm that anyone who challenged Nxivm's practices, including their family members and outside friends, were "suppressives" who they should avoid.  Nxivm members were also often told that they had committed "ethical breaches"—some harm that they purportedly caused the Nxivm community—which they needed to remedy.  "Breaches" were often arbitrary and Nxivm members could be told they were in breach for any number of things including failing to pay debts that they purportedly owed, failing to complete assignments or tasks, supposed lack of work ethic, failing to lose weight or commit to a diet, exhibiting "pride," "playing the victim," or causing negative publicity for Nxivm or Raniere.  The concept of "ethical breaches" was used to manipulate Nxivm members into "healing" the breach by completing tasks that would benefit the defendants and their co-conspirators.

Some Nxivm courses included derogatory teachings about women, including that women are "prideful" and "play the victim card."  One training, titled "Society of Protectors," had a section devoted to humiliating female participants and focused on the need to "break" women's pride.  Nxivm courses also encouraged women to accept that men are naturally interested in having more than one sexual partner whereas women are monogamous.  In breakout groups in other courses, women who had been sexually assaulted were encouraged to consider

19

how they were to blame for what happened to them.  Nxivm members were also taught that if they found anything distasteful or unappealing about the teachings it was because they had an "issue" that they have not yet healed.

    ii.  <u>Admissibility</u>

       Evidence of defendants' and co-conspirators' involvement in the sales practices and teachings described above is direct evidence of the charged racketeering conspiracy.  Their collective involvement in formulating and promoting these teachings and practices, over the course of many years, for the common purpose of obtaining financial benefits for themselves by promoting Raniere and recruiting new members into Nxivm, (<u>see</u> Indictment ¶ 4), demonstrates that the association-in-fact charged in the Indictment is indeed an enterprise with a "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  <u>See</u> <u>Boyle</u>, 556 U.S. at 946 (2009).

       The practices and teachings described above are also highly probative of the pattern requirement because they evidence a number of the alleged means and methods in the Indictment including "[e]ncouraging associates and others to take expensive Nxivm courses, and incur debt to do so, as a means of exerting control over them and to obtain financial benefits for the members of the Enterprise."  (Indictment ¶ 6(g)).  The teachings and practices bear on other means and methods identified in the Indictment as well, such as, "[d]emanding absolute commitment to RANIERE, including by exalting RANIERE's teachings and ideology, and not tolerating dissent" (through, for example, labeling critics "suppressives"), (<u>id.</u> ¶ 6(b)); "[i]nducing shame and guilt in order to influence and control members and associates of the Enterprise," (through, for example, misogynistic teachings, extracting work from people and accusing people of "ethical breaches"), (<u>id.</u> ¶ 6(c)); and "[o]btaining sensitive information about

members and associates of the Enterprise in order to maintain control over them," (through, for example, breakout groups during courses and EMs where participants were encouraged to divulge their darkest secrets), (id. ¶ 6(d)).  The aggressive recruiting practices into pyramid structured organizations is relevant to both pattern and modus operandi, as it links the predicates (including DOS and non-DOS) through association with similarly structured organizations with concentrated power at the top.

Moreover, the sales and employment practices and teachings set forth above are inextricably intertwined with the racketeering conspiracy because an understanding of the victims' exposure to those teachings and practices (including that they—as women—are prideful, weak, "play victim" and that they always seek to blame others or avoid responsibility) is crucial to understanding their states of mind when defendants and co-conspirators coerced them into forced labor and sex trafficking using those same concepts.  For example, in addition to the threat of being sent to Mexico, Jane Doe 4 was told by defendants and co-conspirators that her "pride" (the purported evidence of which was her romantic feelings for someone other than Raniere) was an ethical breach that she needed to heal while confined in the room.  And the DOS victims were initially recruited based on the premise that through collateral (and the threat of its release) they were taking away the option they had been taught that they—as women—always had available to abandon their commitments.[5]  Similarly, the same practices and teachings also

---

[5]     Of course these women did not know that they were going to be put in the position of having to have sex with Raniere or risk release of their collateral, or that their "master," at Raniere's direction, would continue to demand additional collateral from them.

demonstrate knowledge, motive, intent and lack of mistake by defendants and co-conspirators regarding Jane Doe 4's treatment and the treatment of the DOS victims.

Moreover, because several cooperating witnesses perpetuated aggressive sales tactics and coercive teachings with the defendants and co-conspirators, evidence of these practices and teachings is also admissible to corroborate their testimony and to directly address the conduct that is expected to be a focus of their cross-examinations. See Everett, 825 F.2d at 660, Guerrero, 882 F. Supp. 2d at 492.

C.   Cash Smuggling, Structuring, and Tax Evasion

i.   Facts

At trial, the government intends to introduce testimony from a number of former members of Nxivm and other witnesses about efforts by defendants and their co-conspirators, including Nancy Salzman and Lauren Salzman, to arrange for cash received from foreign students for classes taught abroad to be brought into the United States in such a way as to avoid customs reporting requirements (i.e., in amounts purposely designed to stay under the $10,000 limit). Witnesses and documents will also show that defendants and co-conspirators entered cash received from courses into Nxivm's books as scholarships to avoid having to report the cash as income for tax purposes.

The government also intends to introduce evidence of various tax evasion schemes employed by defendants and their co-conspirators, including Raniere, Bronfman, Nancy Salzman and Russell. These schemes involved elaborate corporate structures designed to keep money out of Raniere's name, even though he had access to and control of the funds. The evidence will further demonstrate that the defendants and their co-conspirators considered Raniere as having an interest in other properties and investments. For example, emails indicate

that Bronfman understood Raniere to have a 1/3 interest in her island in Fiji.  Furthermore, the

evidence will demonstrate that Russell frequently orchestrated loans between and among Nxivm-

affiliated entities after being advised that what she was doing was improper.  Witness testimony

and documentary evidence will also demonstrate that the defendants and their co-conspirators

advocated avoiding paying taxes and/or failed to timely file their own tax returns.

ii.  Admissibility

The defendants' and co-conspirators' involvement in the financial schemes

described above, is direct evidence of the charged racketeering conspiracy.  Their efforts to

smuggle money into the United States, falsely report it on Nxivm's books, create elaborate

corporate arrangements, evade taxes and engage in other financial impropriety, demonstrates that

the association-in-fact charged in the Indictment is indeed an enterprise, including the features of

purpose and continuity.  See Boyle, 556 U.S. at 946 (2009).  Moreover, part of the purpose of the

Enterprise was to benefit the "inner circle" financially and to insulate Raniere from taxes and

other liabilities.  This same evidence also demonstrates the relationship of trust among the

defendants and co-conspirators that they would be willing to engage in such dealings, which is

further proof of the Enterprise's existence.  See id.; Williams, 205 F.3d 23, 33-34 (2d Cir. 2000)

The financial schemes are also inextricably intertwined with the conspiracy,

because tax evasion efforts by the defendants and their co-conspirators and their efforts to keep

all assets out of Raniere's name to protect his financial exposure are central to understanding

how the Enterprise functioned.  The same evidence also demonstrates the intent and absence of

mistake of defendants and co-conspirators, including Raniere and Bronfman, as to the events

underlying Racketeering Act Ten and Count Seven.  Raniere has called the allegations

surrounding that act and count "ridiculous," previewing an anticipated defense that there was no

criminal intent in using Jane Doe 7's credit card after her death because he and Jane Doe 7 had been in a relationship and he was the sole beneficiary of her estate. However, the evidence that Raniere deliberately evaded taxes and that his assets were kept in other co-conspirators' names, directly undercuts that argument. This evidence demonstrates that Raniere's use of Jane Doe 7's credit card after her death, rather than going through a proper probate process, was part of a deliberate effort to maintain the fraudulent pretext of not having assets and income to avoid taxes, among other reasons, and that Bronfman – who had helped Raniere maintain that same pretext in the past – knowingly and intentionally supported those efforts.

Moreover, because several cooperating witnesses participated in some of the financial schemes described above, evidence of the schemes is also admissible to corroborate their testimony and to and to directly address the conduct that is expected to be a focus of their cross-examinations. See Everett, 825 F.2d at 660, Guerrero, 882 F. Supp. 2d at 492.

D. Campaign Contribution Evidence

i. Facts

At trial, the government intends to introduce witness testimony and documents demonstrating that in 2007, the defendants and their co-conspirators were involved in an illegal scheme to exceed contribution limits to a presidential primary campaign. Witness testimony, corroborated by documentary evidence, will demonstrate that at least 14 members of the Nxivm community, including at least five defendants and co-conspirators, made the maximum campaign donation to a primary campaign with the understanding that they would be reimbursed by Bronfman or Nancy Salzman. At the suggestion of a political operative, who has since pleaded guilty to an unrelated New York state bribery charge also involving campaign contributions, the contributions were "bundled" and presented to the candidate at a fundraising event attended by

conspirators, including Nancy Salzman.  A cooperating witness who attended the event will testify that the defendants and their co-conspirators made the contributions in hopes of obtaining political influence to advance their own agenda, including targeting perceived enemies of Raniere.  The government will also seek to introduce evidence of similar conduit contributions to other elected officials, as well as use of other political lobbyists in attempts to gain influence.

       ii.  <u>Admissibility</u>

      The defendants' and co-conspirators' involvement in the conduit contribution scheme and related acts described above, is direct evidence of the charged racketeering conspiracy.  Their work together to commit crimes as part of a coordinated effort to curry political favor, evidenced in part by the records of maximum contributions by members of Nxivm on the same day, demonstrates the relationship of trust among the defendants and co-conspirators, which is proof of the Enterprise's existence.  <u>See</u> <u>Boyle</u>, 556 U.S. at 946 (2009); <u>Williams</u>, 205 F.3d 23, 33-34 (2d Cir. 2000).  The same evidence also demonstrates the nature of the criminal relationships between the defendants, which defendants are attempting to portray as a purely legitimate association.

      The evidence of the conduit contributions is also direct evidence of the existence of the Enterprise and the pattern of racketeering activity because it is probative of the defendant and co-conspirators' "us[e of] harassment, coercion and abusive litigation to intimidate and attack perceived enemies and critics of RANIERE," (Indictment ¶ 6(f)).  Specifically, the bundled campaign contributions were part of an attempt to curry favor with a presidential nominee to advance the goals of the defendants and co-conspirators, including by obtaining indictments against enemies and gaining advantages in litigation.  The evidence of the conduit contributions also demonstrates the relatedness of the predicate acts, because it demonstrates the

attitude of defendants and co-conspirators that they must "cheat to win" to fight the conspiracy

they believed was operating against them.  The same motivating force underlies the defendants'

actions with regard to Racketeering Act Two (involving the attempts to monitor perceived

enemies' email accounts) and Racketeering Act Five (involving a scheme to alter discovery

material to be produced in a lawsuit).  Moreover, the conduit contributions is also probative of

motive and intent as to the DOS-related acts and charges, because the evidence at trial will

demonstrate that one of the defendants and co-conspirators purposes in forming DOS was to

have a pyramid of collateralized powerful women who he could order to do things for him or

order to vote in a group to "turn elections."

Finally, because several cooperating witnesses are implicated in the campaign

contribution scheme, such evidence is also admissible to corroborate their testimony and to front

issues that are expected to be raised on cross-examination.  See Everett, 825 F.2d at 660,

Guerrero, 882 F. Supp. 2d at 492.

### E.  Recruitment of Non-Citizens and Immigration Fraud

#### i.  Facts

The government will introduce evidence at trial that the defendants and their co-

conspirators sought to secure visas and immigration status for various non-citizens so that they

could work in one or more Nxivm-affiliated organizations or DOS.  In some instances, the

efforts to secure visas constituted immigration fraud.   As set forth in the government's motion

regarding defendants' assertions of attorney-client privileges (DE 256), Nxivm-affiliated and

Bronfman-controlled entities sponsored dozens of visa applicants.  Some of these visa applicants

sought and obtained visas as "research analysts" for a Bronfman-owned company, but in fact

were employed as "multi-cultural development specialists"—or caretakers of children—by a separate Nxivm-affiliated entity, Rainbow Cultural Garden, LLC.

At trial, the government will also introduce evidence that the defendants and their co-conspirators also assisted Raniere's sexual partners, many of whom did not have legal status, in entering or remaining in the United States. For instance, the government will prove that between approximately August 1, 2011 to September 1, 2018, Russell leased a property under an assumed name in Clifton Park, New York, at Raniere's direction. The residence was used to house a DOS "slave" who was not legally in the United States. Bronfman also made efforts to encourage that same "slave" to remain in the United States. As another example, Bronfman also assisted Jane Does 2 and 3 to enter and remain in the United States unlawfully. Jane Doe 2 had a sexual relationship with Raniere, and Jane Doe 3 was later recruited as a DOS slave, and was assigned to engage in sexual activity with Raniere.

The defendants and their co-conspirators also arranged "sham" marriages, often at Raniere's or Bronfman's direction, so that they could have individuals remain in the United States. For instance, defendant Mack entered into a sham marriage with a co-conspirator and fellow first-line DOS "slave"—although both women were in heterosexual intimate relationships with Raniere—so that the co-conspirator, a Canadian national, could remain in the United States.

ii.  Admissibility

The defendants' and co-conspirators' involvement in the immigration fraud schemes described above, is direct evidence of the charged racketeering conspiracy. Their joint efforts to commit various forms of immigration fraud, for the purpose of obtaining workers or sex partners for Raniere, demonstrates the continuity of the Enterprise, its common purpose and

the relationship of trust among the defendants and co-conspirators.  See Williams, 205 F.3d 23, 33-34 (2d Cir. 2000).

The immigration fraud evidence is also direct evidence of the pattern of racketeering activity because it is demonstrates the relatedness of the predicate acts.  For example, Racketeering Act One is based on a scheme by defendants and co-conspirators to bring someone who was both a sexual partner of Raniere's and a worker for the Enterprise back into the United States illegally, and Racketeering Act Five is based on a scheme by defendants and co-conspirators to bring someone who was a worker for the Enterprise (and who was eventually recruited to be a DOS "slave") back into the United States illegally.  The other immigration fraud evidence helps prove the relatedness of these racketeering act to the Enterprise and to each other because other immigration frauds were committed for similar reasons.  Additionally, this evidence also establishes motive, intent and lack of mistake as to the same acts.

Finally, because several cooperating witnesses are implicated in the immigration fraud schemes, such evidence is also admissible to corroborate their testimony and to directly address the conduct that is expected to be a focus of their cross-examinations.  See Everett, 825 F.2d at 660, Guerrero, 882 F. Supp. 2d at 492.

F.  Evidence of the Recruitment and Grooming of Sexual Partners for Raniere

i.  Facts

At trial, the government expects to prove that the defendants and their co-conspirators recruited and groomed sexual partners for Raniere, both within and outside of DOS, and, at Raniere's direction, actively engaged in efforts to punish coconspirators for so-called "ethical breaches" if their efforts in this regard failed to satisfy Raniere.  Witness testimony and correspondence between the defendants establishes that each maintained an intimate relationship

with Raniere; that each participated in pledges of loyalty and sexual fidelity to Raniere; each was

involved in the same type of extreme calorie restriction and "penances"; and each provided

forms of "collateral" in the form of confessions and damaging secrets.  Many of the defendants

and co-conspirators enforced these same rules on other women who were Raniere's sexual

partners.

Despite claiming to be a renunciate with no money, Raniere directed other

defendants and co-conspirators to provide money to his sexual partners.  The government also

expects to prove, through witness testimony from former sexual partners of Raniere, that

they were harassed and pursued by the defendants when they attempted to leave Raniere.

The government intends to offer evidence that before and after the founding of Nxivm Raniere's

coconspirators groomed sexual partners for Raniere, including one or more underage girls.  For

example, while Raniere was still running CBI, he engaged in a sexual relationship with a girl

beginning when she was twelve or thirteen years old.  A member of CBI who later became a

coconspirator in the charged Enterprise knew the girl's age, knew of Raniere's relationship with

her, and took affirmative steps to aid and abet the relationship in order to please Raniere.

ii.  Admissibility

The defendants' and co-conspirators' own intimate relationships with Raniere and

their knowledge of the others' intimate relationships with him is direct evidence of the

racketeering conspiracy.  Indeed, it is difficult to imagine any more probative evidence of the

"relationship [among the] . . . alleged coconspirators" and the "mutual trust between the

coconspirators" than the fact that they were all having sex with Raniere.  See, e.g., United States

v. Taylor, No. 10-CR-268 DLI, 2012 WL 5546835, at 3 (E.D.N.Y. Nov. 14, 2012).  Moreover,

evidence of the defendants' and co-conspirators' relationships with Raniere is directly relevant to

29

the purpose of the Enterprise and the expectation of defendants and co-conspirators "to receive financial opportunities and increased power and status within the Enterprise."  This is so because the evidence will show that favor with Raniere (including through maintaining a sexual relationship with him on his terms) often directly correlated with increased status in the Enterprise, including greater financial opportunities.

        The evidence of the defendants' and co-conspirators' recruitment, grooming and harassment of Raniere's sexual partners is also direct evidence of the conspiracy because it bears upon several of the means and methods alleged in the Indictment including, clearly, "[r]ecruiting and grooming sexual partners for RANIERE," (Indictment ¶ 6(e)).  The evidence that defendants and co-conspirators convinced women that they had committed "ethical breaches" through perceived betrayals of Raniere and their implementation of punishments and extreme diets is also probative of other means and methods used by defendants and co-conspirators including "[d]emanding absolute commitment to RANIERE," (id. ¶ 6(c)) and "[i]nducing shame and guilt in order to influence and control members and associates of the Enterprise," (id. ¶ 6(d)).  Some of the harassment would also take the form of requiring women who had angered Raniere in some way to confess secrets and submit to EMs by defendants, which is evidence of the defendants' and co-conspirators' "[o]btaining sensitive information about members and associates of the Enterprise in order to maintain control over them," id. ¶ 6(d), another one of the means and methods of the Enterprise described in the Indictment.

        The same evidence is also direct evidence of the pattern requirement because it demonstrates all defendants' knowledge of and participation in practices (such as pledges of loyalty, extreme dieting and provision of collateral), which are hallmarks of the DOS-related charges, and because it demonstrates that the treatment of Jane Does both within and outside of

DOS were not anomalous events. Rather, they were examples of an ingrained way in which the Enterprise worked, i.e., defendants and co-conspirators recruited and exploited other women for work and sex to increase their own power and status with Raniere, and thus, within the Enterprise. While certain defendants have sought to portray themselves in pretrial filings as "non-DOS" participants and, if anything, white collar criminals, this evidence demonstrates that the abuse of women was known, tolerated and aided by some of these same defendants.

Additionally, this evidence also establishes motive, intent and lack of mistake as to Raniere and Lauren Salzman for Racketeering Act Six, because the confinement of Jane Doe 4 arose out of her having angered Raniere by having developed romantic feelings for another man. Evidence of the way defendants and co-conspirators' rallied on other occasions to harass, manipulate and punish women after they had fallen out of favor with Raniere is probative of the intent of members of the Enterprise to do the same in the case of Jane Doe 4. This is particularly important because Raniere has indicated in numerous pretrial findings that he will attempt to place blame for Jane Doe 4's confinement entirely on her family. Similarly, this evidence is also probative of Raniere and Lauren Salzman's motive, intent and lack of mistake as to the DOS Acts. Just as Raniere and Salzman had done with other women outside of DOS (including Jane Doe 4), within DOS Raniere created a structure whereby women agreed to extract work and sex from other women for his benefit and to maintain and increase their own status with him and receive personal benefits.

Finally, the evidence of Raniere's sexual relationship with an underage victim prior to the formation of Nxivm and his coconspirators' role in aiding and abetting the relationship is admissible to prove motive, intent, plan, lack of accident, and lack of mistake as to the structure of Nxivm and DOS, including Raniere's demand that those below him in the

31

Enterprise recruit and groom sexual partners for him; his subsequent sexual relationship with a fifteen year old girl who eventually, once she was an adult, became a first line DOS "slave"; the extreme and criminal lengths to which his codefendants and coconspirators went to please him; and the extreme and criminal lengths to which he went in demanding absolute commitment from those below him in the charged Enterprise.

Moreover, because several cooperating witnesses are implicated by this evidence, such evidence is also admissible to corroborate their testimony and to front issues that are expected to be raised on cross-examination.  See Everett, 825 F.2d at 660, Guerrero, 882 F. Supp. 2d at 492.

### G.  Surveillance and Harassment of Nxivm Enemies

#### i.  Facts

The government intends to introduce at trial evidence that the defendants and their co-conspirators engaged in aggressive, and, at times, illegal, methods of investigating perceived enemies of Raniere.  For instance, the trial evidence will show that Raniere, Bronfman, and Nancy Salzman, among others, engaged an investigative firm that obtained information such as bank statements belonging to perceived Nxivm critics and others.  The targets of these efforts included federal judges overseeing litigation in which Nxivm was a party, political operatives, high-ranking politicians, reporters, ex-girlfriends of Raniere, Nxivm's own lawyers, legal adversaries and their families, John Doe 2 and John Doe 1's employer.  These efforts were undertaken, in part, to attempt to gather evidence of a conspiracy defendants and co-conspirators believed that John Doe 2 was spearheading to ruin Nxivm and to gain an advantage in litigation against perceived enemies.

At times, the defendants and their co-conspirators discussed these efforts in coded language and discussed the illegality of the information.  For example, in one email, defendants and co-conspirators discuss efforts at "trying to legitimize" the banking information they had paid to obtain.  The defendants and co-conspirators hired another investigative firm that they paid to try and obtain an email password and to conduct a "sting" operation to gather information from Rick Ross, who they were suing, without his counsel present.

ii.  Admissibility

This evidence is direct evidence of the racketeering conspiracy because the joint efforts of defendants and co-conspirators (which were time and resource intensive) to surveil their perceived enemies demonstrates that the association-in-fact charged in the Indictment is indeed an enterprise, including the features of continuity and a relationship of trust among the defendants and co-conspirators.  See Boyle, 556 U.S. at 946 (2009).  This relationship of trust is particularly clear because a number of defendants and co-conspirators are included together on emails where they use coded language and secret email accounts, demonstrating their awareness of the schemes' illegality.

This same evidence is also direct evidence of the racketeering conspiracy because it evidences defendants' and co-conspirators' use of "harassment, coercion and abusive litigation to intimidate and attack perceived enemies and critics of RANIERE," (Indictment ¶ 6(f)), which is one of the alleged means and methods in the indictment, because the surveillance evidence was meant in part to give defendants and co-conspirators an advantage in litigation.

Evidence of the defendants' and co-conspirators' surveillance of perceived enemies is also inextricably intertwined with the racketeering conspiracy.  The evidence completes the story of Racketeering Acts Two (monitoring the email accounts of John Doe 1 and

33

John Doe 2) and Three (alteration of discovery material), because there is overlap among the victims of those charged crimes and the defendants' and co-conspirators' surveillance targets. Furthermore, the victims in both situations were targeted because of the defendants' and co-conspirators' belief that there was a conspiracy, led by John Doe 2, to ruin Raniere and Nxivm. For similar reasons, the surveillance evidence also demonstrates the defendants' and co-conspirators intent and absence of mistake as to these related racketeering acts.

Moreover, because several cooperating witnesses were involved in the surveillance of perceived enemies, such evidence is also admissible to corroborate their testimony and to directly address the conduct that is expected to be a focus of their cross-examinations. See Everett, 825 F.2d at 660, Guerrero, 882 F. Supp. 2d at 492.

H.   Abusive Litigation and Obstruction Evidence

i.   Facts

For many years the defendants and their co-conspirators used the legal system to seek retribution against individuals who left Raniere, defected from the Nxivm community or who spoke critically of either, including through the lawsuit underlying Racketeering Act Three. Nxivm has pursued both criminal charges and civil lawsuits in at least three countries. At trial, the government will offer the testimony of witnesses to establish that the defendants instituted these actions in order to instill fear in members of Nxivm and defectors of the organization.

The defendants, and, in particular, Bronfman, sought the assistance of law enforcement to prosecute perceived enemies of Raniere or Nxivm. As one example, in or about 2009, the defendants and their co-conspirators unsuccessfully attempted to have criminal charges instituted against a former sexual partner of Raniere. More recently, in the wake of public disclosure of DOS, Bronfman asked whether any legal charges could be brought against DOS

victims.  In July 2017, Bronfman unsuccessfully sought to have criminal charges instituted in Canada against a DOS "slave."  After Raniere and Bronfman were alerted to the fact that The New York Times would shortly be publishing an article about DOS, Raniere and Bronfman drafted threatening letters addressed to DOS victims and engaged attorneys in Mexico to contact the DOS "slaves," including Jane Does 8 and 9, to send the letters.

The government will also introduce evidence that Raniere testified untruthfully in a copyright infringement suit against Microsoft and AT&T—a lawsuit that co-conspirators Bronfman and Nancy Salzman took an active role in his bringing.  See Raniere v. Microsoft, et al., 15-CV-540 (N.D. Tex. 2017).  Raniere provided false and inconsistent information as to his ownership of the patents at issue, and after he was ordered to pay attorney fees because of his conduct, he submitted a signed declaration purporting not to have access to funds, drafts of which were reviewed by co-conspirators including Bronfman and Nancy Salzman.  Raniere then went on to bring a related lawsuit in Washington State, which was promptly dismissed, again resulting in an award of attorney fees for his conduct.

ii.  Admissibility

The evidence described above is direct evidence of the racketeering conspiracy because it demonstrates a relationship of trust between and among the defendants and co-conspirators who galvanized coordinated, long-term efforts to carry out abusive litigations and campaigns to bring criminal charges against perceived enemies.  See Boyle, 556 U.S. at 946 (2009).  It is also direct evidence of the pattern requirement because it bears upon the alleged mean and method of "[u]sing harassment, coercion and abusive litigation to intimidate and attack perceived enemies and critics of RANIERE," (Indictment ¶ 6(f)).

This evidence is also inextricably intertwined with the charged conspiracy because it provides necessary background and context for victims and witnesses who will say that they were afraid to leave or speak out because of fear of being subjected to the type of harassment other defectors had faced.  Defense counsel has already seized upon positive statements by certain witnesses and victims when they left Nxivm and affiliated organizations as evidence that they were happy with their experiences and are now lying.  Where appropriate, the government is entitled to corroborate witnesses and victims who say they attempted to give the appearance of leaving on good terms out of fear of being dragged into years of litigation or having criminal charges brought against them.

Moreover, the evidence regarding the <u>Microsoft</u> case is relevant to Raniere and Bronfman's knowledge, intent and absence of mistake regarding Racketeering Act Ten and Count Seven, because Raniere's statement to the court that he had no assets at the same time that he and the mother of his child were incurring $10,000-a-month bills on Jane Doe 7's credit card demonstrates that the act was not an innocent mistake of someone who was Jane Doe 7's sole beneficiary.  Rather it was a deliberate and fraudulent effort to portray Raniere as a renunciate and to allow him to avoid the consequences of having assets in his name.

## I. Conduct After DOS was Exposed

### i. Facts

 Once DOS was exposed within the Nxivm community, defendants and their co-conspirators initiated a disinformation campaign to protect the Enterprise.  For example, defendants and co-conspirators, including Bronfman, hired private investigators to investigate and disparage Nxivm defectors and public relations firms to "rebrand" DOS and distance it from Nxivm.  This public relations campaign continued once DOS was exposed in national media

outlets.  For example, defendants and co-conspirators, including Raniere and Bronfman, issued public statements in support of DOS and denying Raniere's involvement.

Moreover, shortly after the media exposure regarding DOS, Raniere and Bronfman decided to remain indefinitely in Mexico.  By December 2017, media outlets had reported that the Eastern District of New York had launched a criminal investigation into Raniere.  In or around this time, Raniere stopped using the phone number he had used for over fifteen years and Raniere and Bronfman switched to using encrypted email addresses.

A sealed arrest warrant was issued for Raniere in February 2017.  For over a month and a half he could not be located.  Raniere was apprehended in March 2018 by Mexican police at a luxury resort where he was staying with a number of first-line DOS "slaves," including Mack and Lauren Salzman.  At trial, the government will introduce evidence that the women tried to hide Raniere from law enforcement in a back room of the villa where they were staying.

Immediately after Raniere was arrested, Nancy Salzman organized a meeting where she instructed members of the community to notify her if they received subpoenas, that lawyers would be provided for anyone who received a subpoena and that legal fees would be reimbursed.  Shortly thereafter, Bronfman returned to the United States and she and Nancy Salzman directed potential witnesses to an attorney hired by Bronfman to have him coordinate finding lawyers for the witnesses.  Following Raniere's arrest, when FBI agents visited Clifton Park to interview witnesses and serve subpoenas, defendants and co-conspirators coordinated efforts to prevent members of the community from being approached or served.

After Raniere's arrest, Bronfman funded a legal defense fund to pay for legal fees for Raniere and people who received subpoenas. Bronfman made an initial deposit of approximately $5,000,000, from which her co-defendants' legal fees have been paid.

ii. <u>Admissibility</u>

The steps taken by the defendants and co-conspirators following DOS's exposure to work together collectively to protect Raniere and the Pyramid Organizations establishes the existence the Enterprise and the relationship between and among defendants and co-conspirators. <u>See</u> <u>Boyle</u>, 556 U.S. at 946 (2009). It also establishes the pattern requirement, because it demonstrates the relatedness of the DOS acts to the Enterprise, given the defendants and co-conspirators joint efforts to protect it. The same evidence, as well as Bronfman and Raniere's efforts to evade detection, also demonstrates consciousness of guilt, knowledge and intent as to the DOS acts and related charges.

Additionally, the efforts by the defendants and co-conspirators following Raniere's arrest to circle the wagons and Bronfman's payment of legal fees for her co-defendants is direct evidence of the Enterprise, the relationship between and among the defendants and co-conspirators, and of Bronfman's status within the Enterprise. <u>United States v. Gotti</u>, 771 F. Supp. 552 (E.D.N.Y. 1991) (finding that where a defendant pays significant sums of money for legal service rendered to others, that these "benefactor payments' are relevant to "prove a relationship between the benefactor and his beneficiaries and 'highly relevant to whether the benefactor is the head of a criminal enterprise as defined by the RICO statute'") (quoting <u>United States v. Simmons</u>, 923 F.2d 934, 949 (2d Cir. 1991); <u>see</u> <u>also</u> <u>In re Grand Jury Subpoena Served Upon Doe</u>, 781 F.2d 238, 251 (2d Cir. 1986) (finding that payment of legal representation may be a form of compensation to members of a crime "crew" and that evidence of benefactor

payments was "highly probative of the role of [the benefactor] as head" of a racketeering enterprise).

III. None of the Proffered Evidence is Unfairly Prejudicial

There can be no real argument that the other act evidence described herein is unfairly prejudicial because the vast majority is no "more sensational or disturbing" than the charged crimes, including the allegations about Jane Doe 4's confinement to the room and the DOS-related acts.  Moreover, because these acts involve the defendants' own conduct, any minimal prejudice they might suffer is not "unfair" and does not outweigh, let alone substantially outweigh, the probative value of this evidence.  Pitre, 960 F.2d at 1120.

The lack of unfair prejudice is particularly clear where, as here, the defendants are challenging every aspect of the racketeering enterprise.  While the defendants may seek to preclude certain evidence with an eye toward setting up an argument that the government has failed to present sufficient evidence of the racketeering pattern or its connection to the United States, this obviously would be an improper basis for exclusion.  Rather, the defendants' vigorous arguments – suggesting that the government will be unable to meet its burden with regard to proving the Enterprise and the pattern of racketeering activity – demonstrate the importance of this evidence at trial.  See Mejia, 545 F.3d at 206 ("Where, as here, the existence of a racketeering enterprise is at issue, evidence of uncharged crimes committed by members of that enterprise, including evidence of uncharged crimes committed by the defendants themselves, is admissible 'to prove an essential element of the RICO crimes charged—the existence of a criminal enterprise in which the defendants participated.'") (quoting Matera, 489 F.3d at 120)).

CONCLUSION

In sum, the evidence of uncharged crimes and other acts set forth herein are relevant and admissible to prove the charged crimes, including racketeering conspiracy. Through this and other evidence, the government will prove the existence of the alleged enterprise, the existence and threat of continued criminal activity, the relatedness of the defendants' schemes to the Enterprise and the racketeering pattern.  This evidence is relevant and admissible under Rules 401 and 402, and under Rule 403 its probative value is not substantially outweighed by any unfair prejudice to the defendants, nor will it be cumulative.  Accordingly, the government respectfully submits that this evidence should be admitted.

Dated:     Brooklyn, New York
           February 4, 2019

                                        Respectfully submitted,

                                        RICHARD P. DONOGHUE
                                        UNITED STATES ATTORNEY
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201

Moira Kim Penza
Tanya Hajjar
Mark J. Lesko
Kevin M. Trowel
Assistant United States Attorneys
       (Of Counsel)